# Exhibit 1

*Confidential- Subject to Protective Order*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ADAM JERNOW and LEAH McLAWRENCE, on behalf of themselves and all others similarly situated, | § § § § | |
| | § | CASE NO. |
| Plaintiffs, | § § | 07-CV-3971(LTS) (THK) |
| | § | |
| vs. | § § | |
| | § | |
| WENDY'S INTERNATIONAL, INC., | § | |
| Defendant. | § | |

## DECLARATION OF KEITH R. UGONE, PH.D.

### I.    OVERVIEW OF ASSIGNMENT

1. I have been retained as an economics and damages expert for Wendy's International, Inc. ("Wendy's") in the matter of *Adam Jernow and Leah McLawrence, on behalf of themselves and all others similarly situated v. Wendy's International, Inc.* It is my understanding Adam Jernow and Leah McLawrence, as well as others similarly situated ("Plaintiffs"), allege that Wendy's engaged in deceptive sales practices, breached an implied-in-fact contract, and was unjustly enriched over the period June 8, 2006 through the present.[1]

2. Generally, I understand Plaintiffs allege the following (which Wendy's disputes):[2]

---

[1] Plaintiffs' Second Amended Complaint for Deceptive Sales Practices; Breach of Implied in Fact Contract; Unjust Enrichment ("Second Amended Complaint"), Jan. 25, 2008.

[2] Plaintiffs' Memorandum of Law in Support of Motion for Class Certification ("Class Certification Memorandum"), May 19, 2008, at 15.

*Confidential- Subject to Protective Order*

    a.  that Wendy's allegedly omitted and/or misrepresented material facts in connection with the sales of its french fries;

    b.  that Wendy's labeling, marketing, advertising and/or selling of its french fries allegedly constituted unfair and/or deceptive consumer sales practices;

    c.  that Wendy's allegedly breached an implied-in-fact contract with its customers; and

    d.  that Wendy's was unjustly enriched by its alleged wrongful conduct.

3.  I understand Plaintiffs claim the alleged wrongful conduct is subject to class-wide proof, whereby Plaintiffs must satisfy Rule 23(a) that:

    a.  the Class is so numerous that joinder of all members is impracticable;

    b.  there are questions of law or fact common to the Class;

    c.  the claims or defenses of the representatives are typical of the claims or defenses of the Class; and

    d.  the representative parties will fairly and adequately protect the interests of the Class.[3]

The Plaintiffs' proposed Class includes "all New York residents who purchased french fries from Wendy's . . . from June 8, 2006 to the present . . . within the state of New York."[4]

4.  Plaintiffs allege that the proposed Class paid a price premium for certain Wendy's food products based upon alleged inaccurate representations regarding the trans-fat content of those products. Specifically, Plaintiffs allege that "all Class members paid a premium for purportedly trans-fat free french fries (and did not receive what they bargained for), [and] there are no individual issues regarding whether Class members

---

[3] I also understand that (a) common claims must predominate over individual issues and (b) a Class action must be a superior method and must have best notice practicable with opt out.

[4] Class Certification Memorandum, at 1.

*Confidential- Subject to Protective Order*

conferred a benefit on Wendy's and whether Wendy's knowingly received that benefit without adequately compensating Class members."[5]

5. I have been requested by counsel for Wendy's to evaluate the Plaintiffs' claim that all New York residents who bought Wendy's french fries since June 8, 2006 form a Class of purchasers affected similarly by Wendy's alleged wrongful conduct.

## II.    QUALIFICATIONS AND EXPERIENCE

6. I am a Managing Principal at Analysis Group, Inc. ("AG"). AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. Nationally, AG consists of approximately 400 professionals who specialize in, among other things, the fields of economics, statistics, finance, and strategy consulting.

7. My primary responsibility at AG is to provide economic and financial consulting services to clients. Throughout my career, I have provided economic and financial consulting services in antitrust cases, intellectual property cases, breach of contract cases, fraud-related cases, business tort cases, business interruption cases, employment-related disputes, lender liability cases, reasonable compensation matters, and securities-related cases. I have provided expert testimony in deposition and trial settings numerous times.

8. Economic analyses I have conducted have included defining relevant markets, assessing the presence or absence of market power, evaluating whether a business activity was pro-competitive or anti-competitive, and/or evaluating the level of

---

[5] Class Certification Memorandum, at 21-22. Bracketed term added for clarification.

*Confidential- Subject to Protective Order*

competition in a given market. I also have performed "event" studies in securities-related matters and analyzed general market trends for specific products and industries. Financial or damages models I have constructed or evaluated have had as components pricing analyses, revenue analyses, lost sales analyses, incremental cost analyses, assessments of the capacity to produce additional units, assessments of profitability, and the assessment of lost profits. I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams. During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models. I specialize in the application of economic principles to complex commercial disputes. I have been qualified as an expert witness on economic and damages-related issues numerous times in the course of my career, in both state and federal courts.

9. I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983. Attached as **Exhibit 1** is a true and correct copy of my current resume. A listing of publications I have authored is contained in my resume. Attached as **Exhibit 2** is my trial and deposition testimony experience. My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219. AG is being compensated based upon hours incurred and the hourly rates of the personnel involved. Payment to AG is not contingent upon my findings or the outcome of this matter. AG is being

4

*Confidential- Subject to Protective Order*

compensated at a rate of $525 per hour for my time. Other staff at AG working on this matter are being compensated at their normal hourly rates.

## III.  FACTS, DATA, AND OTHER INFORMATION CONSIDERED

10. A complete listing of the documents available to me in performing my analyses is contained in the attached **Exhibit 3** or elsewhere in my declaration (including footnotes). The general categories of documents available to me included the following:

   a. legal documents and declarations (e.g., Second Amended Complaint; Class Certification Memorandum; Declaration of Michael R. Reese, January 23, 2008; etc.);

   b. deposition transcripts and associated exhibits (e.g., Deposition transcript of Adam Jernow, May 7, 2008; Deposition transcript of Leah McLawrence, May 8, 2008; Deposition transcript of Casey Minton, April 22, 2008; Deposition transcript of Lori Estrada, May 6, 2008);

   c. documents produced by Wendy's (e.g., price data; marketing materials; emails; etc.); and

   d. information independently obtained (e.g., information from websites, etc.).

11. My analyses and opinions are based upon the information available, standard economic theory, and my education and training. The information I am relying upon is information typically relied upon by experts in my field. I reserve the ability to review documents, deposition transcripts, expert reports, or other information recently produced or still to be produced by the Parties to this dispute and to supplement my opinions based upon that review, if appropriate. I also reserve the ability to provide further rebuttal opinions and testimony in this matter.

*Confidential- Subject to Protective Order*

## IV. BACKGROUND TO THE PARTIES IN THIS DISPUTE

### A. Adam Jernow, Leah McLawrence And All Others Similarly Situated ("Plaintiffs")

12. Plaintiff Adam Jernow is a New York resident, currently self-employed as a manager of residential properties. He has formed two LLCs (OGI Holdings and OGI Management) which serve as his main source of income.[6] Mr. Jernow testified in deposition that he purchased Wendy's french fries during the proposed Class period. Mr. Jernow also testified that if the actual amount of trans fat had been disclosed, he would not have made the purchases or paid what Plaintiffs refer to as a "premium" price.[7]

13. ███████████████████████████████████████████

███████████████████████████████[8] Ms. McLawrence testified in deposition that she purchased Wendy's french fries during the proposed Class period. Ms. McLawrence also testified she would not have made the purchases nor paid a "premium" price if the actual amount of trans fat had been disclosed.[9]

---

[6] Deposition transcript of Adam Jernow, May 7, 2008, at 5-6, 16.

[7] Second Amended Complaint, ¶ 7. In his deposition, Mr. Jernow admits he does not remember how much he paid for his french fry purchases. (Deposition transcript of Adam Jernow, May 7, 2008, at 70.) Mr. Jernow also contends that he would not have eaten the Wendy's french fries he understood that they were not trans-fat free, yet he disclaims any physical or monetary injury. (Deposition transcript of Adam Jernow, May 7, 2008, at 135, 139-140.)

[8] Deposition transcript of Leah McLawrence, May 8, 2008, at 7-8.

[9] Second Amended Complaint, ¶ 8. Ms. McLawrence claims that if she had been aware of the trans-fats levels contained in Wendy's french fries, she would not have expected a lower price, but would not have eaten at Wendy's at all. Ms. McLawrence acknowledges that despite knowing fried foods contained trans fat, and that french fries are fried foods, she continued to eat at McDonald's and Burger King without considering the trans-fat content of those foods. Deposition transcript of Leah McLawrence, May 8, 2008, at 73-4, 85-6.

*Confidential- Subject to Protective Order*

### B.  Wendy's International, Inc. ("Wendy's")

14. Wendy's International, Inc., headquartered in Dublin, Ohio, was founded by Dave Thomas in 1969.  Wendy's is primarily engaged in the business of operating, developing, and franchising a system of quick-service restaurants ("QSRs").[10]  As of 2007, Wendy's had become the third-largest fast food hamburger restaurant in the world, with approximately 6,312 restaurants in North America and 333 internationally.  Among these, roughly 1,400 are company-owned stores; the remaining approximately 5,200 restaurants are franchise stores.[11]  As of 2007, Wendy's had 66 company-owned stores and 156 franchised stores in the State of New York.[12]  On April 24, 2008, Wendy's announced that it would be acquired by Triarc Companies Inc.[13]

## V.    BACKGROUND TO THE QSR MARKETPLACE

### A.  The QSR Marketplace

15. The fast food industry generated sales of approximately $170 billion in 2007 with an average pre-tax operating profit margin of roughly 15.0 percent.[14]  Among the 2,200 QSR chains in the U.S., the major competitors include McDonald's, Burger King, Wendy's, Yum Brands (which owns Kentucky Fried Chicken, A&W, Pizza Hut,

---

[10] Wendy's International Inc., Annual Report (Form 10-K), at 1 (Feb. 27, 2008).

[11] Wendy's Restaurant Data, available at http://www.wendys-invest.com/main/restaurant_data.  Company-owned stores are those owned and operated by the company, unlike franchise stores, which are owned and operated by franchisees that pay royalties to the company.

[12] Wendy's International Inc., Annual Report (Form 10-K), at 12 (Feb. 27, 2008).

[13] *See* "FTC Approves Triarc's Buyout of Wendy's," May 30, 2008, available at http://sanantonio.bizjournals.com/columbus/stories/2008/05/26/daily34.html.

[14] Larry Miller et al., RBC Capital Markets, "Miller's Digest – Q1 2007 Quarterly Restaurant Review," Jun. 8, 2007 at 11.  Wendy's pre-tax operating profit was less than half this average, at 6.3 percent in 2007.  Larry Miller et al., RBC Capital Markets, "Miller's Digest - Q4 2007 Quarterly Restaurant Review," Apr. 1, 2008 at 31; Mitchell J. Speiser and Brian J. Wang, Buckingham Research Group, "Burger King Holdings (BKC) Initiating Coverage with A Strong Rating," Apr. 15, 2008 at 12.

*Confidential- Subject to Protective Order*

Long John Silvers and Taco Bell), Hardee's, Sonic, and Jack in the Box, among others.[15]  Many QSRs operate company-owned stores and have franchisees that own and operate stores in exchange for royalty payments to the company.[16]

16. Because QSRs often compete for the same customers, offering competitive menu items at similar prices is important to attract and retain customers.[17]



[18]  Nevertheless, menu pricing decisions at franchised stores are made by the individual franchisees.[19]

---

[15] John S. Glass et al., CIBC World Markets, "Our 2007 Annual Unit Count Survey - Casual Dining Finally Reaches and Inflection Point: Bodes Well for Future SSS," Oct. 7, 2007, at 11.

[16] Generally, Wendy's does not sell food or supplies directly to its franchisees, instead arranging for independent distributors to purchase certain products directly from company-approved suppliers and sell them to local franchisees.  Wendy's International Inc., Annual Report (Form 10-K), at 1 (Feb. 27, 2008).

[17] For example, to compete with McDonald's successful placement of its double cheeseburger on its Dollar Menu (which has been available in most U.S. regions since late 2002), Wendy's announced the national launch of a $0.99 double cheeseburger (the "Stack Attack") in December 2007.  *See* Melanie Warner, "Salads or No, Cheap Burgers Revive McDonald's" *New York Times*, Apr. 19, 2006; Wendy's Press Release, Dec. 18, 2007, available at http://www.wendys-invest.com/ne/wen121807.php.



*Confidential- Subject to Protective Order*

[22]

### B. QSR Consumer Characteristics

17. The rationale behind QSR pricing can be explained by the many QSR customers for whom "value" and "price" are important considerations.

[23]

[24]    Similarly, a Deutsche Bank survey reported that taste, price, and service/employees were the three most cited factors influencing where to eat out.[25]

---

[20] Wendy's PowerPoint Presentation, "Competitive and Franchise Pricing Survey Analysis: Spring 2006 Surveys," Presented by Casey Minton, Jun. 2006, at WEN-027689-99.

[21] Wendy's Excel File "Competitive Hamburger Pricing – Spring 2006.xls," at WEN-002339.

[22] *See* Wendy's New England Franchise Exhibits – Spring 2006, "New York (NY) DMA Franchise Pricing Data Spring 2006," Eight Company Store and Fourteen Franchise Surveys, at WEN-027741. Franchisee prices increased from Fall 2005 to Spring 2006 for these same products, while company-owned store prices remained the same *See* Francine Lafontaine, "Pricing Decisions in Franchised Chains: A Look at the Restaurant and Fast Food Industry," *NBER Working Paper*, Sept. 1995, demonstrating that prices in franchised and corporate units are systematically different; Itai Ater and Oren Rigibi, "Price Advertising in Franchised Chains: The Case of McDonald's Dollar Menu," Nov. 2007, discussing pricing differences between franchised and company-owned stores.

[23] Wendy's PowerPoint Presentation, "Competitive and Franchise Pricing Survey Analysis." Triunal Meeting, Presented by Casey Minton, Jun. 21, 2006, at WEN-011900.

[24] Wendy's PowerPoint Presentation, "Competitive and Franchise Pricing Survey Analysis." Triunal Meeting, Presented by Casey Minton, Jun. 21, 2006, at WEN-011900.

[25] Jason West et al., Deutsche Bank, "Restaurants Transferring Coverage - Reservations Available," Jun. 7, 2007 at 17.

*Confidential- Subject to Protective Order*

████████████████████████████

████████████████████[26]

### C. Wendy's French Fries

18. Wendy's sells its french fries either individually (à la carte) or with a sandwich/burger and drink as a combination meal. Over the past few years, Wendy's has offered its french fries in a variety of serving sizes ranging from kid's (2.5 oz.) to large (6.7 oz.).[27] The sizes of the french fry servings, the cooking oil used to prepare the fries, and the prices charged for the different sizes have all varied throughout the proposed Class period.

## VI.  CLASS CERTIFICATION – OVERVIEW

19. Plaintiffs allege that they paid a premium for Wendy's french fry products because of Wendy's alleged inaccurate representations regarding the trans-fat content of those products. In order for Plaintiffs' price premium contentions to hold:

    a. a price premium for low trans-fats french fries needs to have existed during the proposed Class period; and

    b. Class members must have made their french fry purchase(s) by reason of Wendy's trans-fat representations, believing they were paying more for low trans-fat french fries.

20. In order for Wendy's to have been unjustly enriched, the Plaintiffs need to show that:

    a. every Class member must have made their french fry purchase(s) based upon Wendy's trans-fat representations and would not have purchased the french fries in the absence of the allegedly misrepresented trans-fat claim; and

---

[26] Wendy's PowerPoint Presentation, "Competitive and Franchise Pricing Survey Analysis." Triunal Meeting, Presented by Casey Minton, Jun. 21, 2006, at WEN-011901.

[27] I understand that the naming convention for Wendy's french fries has changed over the relevant period. Prior to August 2006, Wendy's french fry sizes from smallest to largest were: Small, Medium, Biggie, and Great Biggie. In or around August 2006, the names were changed to Kid's, Small, Medium, and Large, respectively.

*Confidential- Subject to Protective Order*

b.  every Class member paid a "premium" price for Wendy's french fries.

If an individual customer felt the price paid reflected the value of the french fries absent the alleged trans-fat representations, then no price premium existed for that customer and Wendy's was not unjustly enriched.

## VII.  FRAMEWORK FOR EVALUATING A PRICE PREMIUM

21. A price premium generally is defined as a consumer's willingness to pay a higher price for a product relative to a lower-priced benchmark. A consumer's willingness to pay a price premium can arise from a number of different demand-side factors such as the price of the good in question, attributes of the product at issue, income, the price of substitute goods, the price of complementary goods, tastes and preferences, and demographic or socio-economic characteristics. A price premium also can result from supply-side factors such as technology (i.e., how inputs are combined to produce output) and the price of inputs (e.g., raw materials, labor, and capital).[28] In other words, it may cost more to produce a product containing the attributes for which the price premium is charged.

22. Generally, data on the demand-side factors which are important to consumer purchasing decisions are not collected at the time customers make a purchase. To properly calculate a consumer's willingness to pay for a product, economists traditionally observe consumer purchasing behavior or use survey instruments. Economists use similar techniques to identify the factors which influence the consumer's willingness to pay for a particular product and the relative importance of

---

[28] *See for example,* Yuko Onozaka, et al., "What Exactly are They Paying For? Explaining the Price Premium for Organic Fresh Produce," *University of California Giannini Foundation Agricultural and Resource Economics Update,* Jul./Aug. 2006.

*Confidential- Subject to Protective Order*

each of the identified factors.[29]  Any observed "price premium" reflects the interplay

between the value consumers place on the features differentiating the product and the

cost of producing that product differentiation.[30]

23. To assess whether consumers paid a price premium for Wendy's low trans-fat french

    fries, the existence and magnitude of the price difference between Wendy's french

    fries and a benchmark must be established.  A price premium can be analyzed using a

    prior (presumably lower) price for the same product as a reference point or using

    competitor prices as a reference point.  ███████████████████████

    ██████████████████████████████████████████████████

    ████████████████[31]

24. In addition, individualized purchaser characteristics should be analyzed, including but

    not limited to:

    a.  awareness of Wendy's trans-fat claims;

    b.  preference for low trans-fat foods; and

    c.  other considerations that impact purchase decisions such as the price of the
        product in question, income, convenience (including but not limited to the
        location of the store or availability of a drive-through), time of purchase, interest

---

[29] *See e.g.* Kelly B. Maguire, et al., "The Price Premium for Organic Babyfood: A Hedonic Analysis," *Journal of Agricultural and Resource Economics, 2004* 29(1):132-149; Geoffrey Donovan and David Nicholls, "Estimating Consumer Willingness to Pay a Price Premium for Alaska Secondary Wood Products," *USDA Research Paper PNW-RP-553*, Oct. 2003; Yuko Onozaka, et al., "What Exactly are They Paying For?  Explaining the Price Premium for Organic Fresh Produce," *University of California Giannini Foundation Agricultural and Resource Economics Update*, Jul./Aug. 2006.

[30] *See* Kelly B. Maguire, et al., "The Price Premium for Organic Babyfood: A Hedonic Analysis," *Journal of Agricultural Economics and Resource, 2004* 29(1): 132-149, at 135.  It would be incorrect to assume that an observed "premium" would be completely passed through to the supplier in the form of additional profits. In this matter, costs associated with changes to the cooking process and advertising expenses, among others, would be relevant costs that would be deducted from any potential price premium-related unjust enrichment claim made by Plaintiffs.

[31] ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

*Confidential- Subject to Protective Order*

in on-going promotions, the prices associated with substitute products, and the prices associated with complementary products, *inter alia*.

Inquiry into each of these factors would help identify whether a Class member paid a price premium for the french fries at issue and whether Wendy's was unjustly enriched.

## VIII. THE EXISTENCE AND MAGNITUDE OF A PRICE DIFFERENCE

25. Plaintiffs claim that Class members were damaged and Wendy's was unjustly enriched from an alleged "price premium" charged by Wendy's for all of its french fries sold since August 2006, after Wendy's switched its in-store cooking oil.[32] Plaintiffs observe that Wendy's suggested an increase in the price of its french fry products around the same time that Wendy's marketed its offering of low trans-fat french fries. Plaintiffs allege that this price change reflects a "price premium." However, to the extent Plaintiffs are unable to demonstrate that the observed price changes were a direct and proximate result of the alleged wrongful conduct and that such wrongful conduct induced Class members to purchase Wendy's french fries at a premium price, there would be no economic injury to the proposed Class members.[33]

---

[32] Notice of Motion and Motion for Class Certification, May 19, 2008, at 3.

[33] It is my understanding that Wendy's denies the Plaintiffs' contention that the price change was related to the trans-fat change. My review of the materials produced to date indicates an economic causal connection between these two events is not supported by documentary evidence and deposition testimony.



13

*Confidential- Subject to Protective Order*

26. Even if one were to assume for the purposes of this discussion that the change in price for à la carte french fries was solely related to the trans-fat representations in dispute, the observed variations in the change in prices for french fries across stores would require individual inquiry to establish the injury to each proposed Class member. One reason variations in changes in prices exist is because the suggested price change was for company-owned stores, and did not apply to the franchisees who were already pricing at different levels.[34]





27. Additionally, Wendy's acknowledged that



[36] Consistent with this document, there is no directive that a uniform or single price was charged (or should be charged) across

---

[34] Deposition transcript of Casey Minton Apr. 22, 2008, at 18. Wendy's only recommends price changes to franchisees.

[35] Memorandum from Dave Near and Ian Rowden to All Wendy's Company Field Operations and Marketing Personnel Regarding Price Increases in Company Stores, Jun. 24, 2006 ("Near Memorandum, Jun. 24, 2006") at WEN-002314.

[36] Near Memorandum, Jun. 24, 2006, at WEN-002315.

*Confidential- Subject to Protective Order*

Wendy's company-owned stores and/or franchised stores for french fries    In fact, there have been variations in french fry prices across company-owned stores and franchised stores before and after the price change in July 2006.

28. A review of Wendy's pricing data yields the following observations.



29. Based upon the above discussion, one would also expect to see variation at the individual store level within New York State.  New York is divided into two distinct areas -- the first is comprised of Long Island and Manhattan and the second is comprised of Albany, Syracuse and Rochester (where no company-owned stores

---

[37] Wendy's Excel File "Consolidated Franchise Totals -- Simple Average of DMA's," 2006, at WEN-022341.

[38] Wendy's Excel File "Total Franchise Only -- Simple Average of Franchise-Only DMAs," Fall 2006, at WEN-022368.

[39] Wendy's Excel File "Total Franchise Only -- Simple Average of Franchise-Only DMAs," Fall 2006, at WEN-022387.

[40] Wendy's Excel File "Total Franchise Only -- Simple Average of Franchise-Only DMA's," Fall 2006, at WEN-022370.

[41] Wendy's Excel File "Consolidated Franchise -- Fall 2006.xls," New-York, NY, Fall 2006, at WEN-115301.

*Confidential- Subject to Protective Order*

exist.)[42]  Consistent with economic principles, each store in these areas would likely change prices in response to its own competitive situation.[43]   Given different economic and competitive conditions, variations would exist (a) across the price of each product, (b) in the magnitude of the price changes for each product, and (c) in the timing of the price changes. ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████.[44]   Individual inquiry would be required for each proposed Class member to identify the location of each purchase within New York and to establish the timing of purchase.

30. Moreover, prices charged for french fries as part of a "combo" meal are not disaggregated from the price for the hamburger and drink.  As with the prices for à la carte french fries, the prices of combination meals vary widely across locations and time.[45]   Although combination meal prices increased during the proposed Class period, it is unclear whether the price changes are attributed to the sandwich/burger,

---



[42] The first market also includes New Jersey.  Deposition transcript of Casey Minton, Apr. 22, 2008, at 30-32.

[43] ████████████████████████████████████████████████████████████████

[44] ████████████████████████████████████████████████████████████████

[45] ████████████████████████████████████████████████████████████████

*Confidential- Subject to Protective Order*

fries, or drink, as each of these individual products also may have experienced their own suggested à la carte price changes.

31. Lastly, Plaintiffs' proposed Class fails to recognize that the July 2006 recommended price changes (which occurred around the time of the in-store cooking oil change) were only for medium and large serving sizes of french fries. I understand that there were no recommended price changes for kid's or small serving sizes at any point in 2006 or 2007. Thus, even under Plaintiffs' theory of economic harm, not all french fry purchasers would have paid a price premium. Individual inquiry would be required to determine the size of french fries purchased by each putative Class member.

32. Thus, individual inquiry is required to determine:

   a. the different french fry products and sizes purchased;

   b. the different combination meals purchased, if any;

   c. the location of each purchase;

   d. the different points in time for each purchase; and

   e. the existence and magnitude of the alleged price premium for each purchase at the different locations at different points in time.

33. Should a price premium be identified through this inquiry, it still will be necessary to evaluate individual purchaser characteristics to determine whether such a price premium was paid based on Wendy's trans-fat representations or for other reasons.

## IX. INDIVIDUAL PURCHASE DECISIONS

### A. Individualized Inquiry Is Required To Establish Different Customer Awareness Of Trans-Fat Representations

34. In addition to determining the existence of a price premium, from an economic perspective it would be necessary to examine whether a potential Class member was even aware of Wendy's reduced trans-fat announcement(s) prior to their purchase. Similarly, it would be necessary to identify which particular representation the Class member saw or heard and the source of the information. Relevant inquiries include:

   a. if a putative Class member saw something, what did they see?;

   b. if a putative Class member heard something, what did they hear?; and

   c. was the source of information published by Wendy's or was the characterization provided by another source?

35. Customers' knowledge regarding the trans-fat content of Wendy's french fries likely came from different sources. For example, Wendy's press releases stated that Wendy's reduced (but did not eliminate) trans fat by ninety five percent.[46] News stories on the radio may have characterized this information differently.[47] Nutritional posters may have been noticed by in-store customers, but not by drive-through

---

[46] Wendy's Press Release, Jun. 8, 2006 available at http://www.wendys-invest.com/ne/wen060806transfat.php. The press release shows new trans-fat levels to be 0 grams (Kid's) and 0.5 grams (Small, Medium and Large). Wendy's communication's department issues all press releases. Deposition transcript of Lori Estrada, May 6, 2008, at 25-26.

[47] Ms. McLawrence claims to have heard someone mention something about Wendy's trans fat content on the radio but she does not know if this was an advertisement or news announcement. Deposition transcript of Leah McLawrence, May 8, 2008, at 69-70.

*Confidential- Subject to Protective Order*

customers.[48]   Packaging identifying "0g Trans Fat" may have been observed by
certain customers.[49]

36. Assuming putative Class members even read or heard this information, it would have
had a varied impact across customers. Each customer would have retained different
information based on their individual understanding of the information presented by
different sources. Some customers might believe that Wendy's food was completely
free of trans fat. For example, Mr. Jernow does not remember how he heard that
Wendy's food allegedly was trans-fat free, only that "it was an impression" he had,
believing that he may have seen bag labels, print advertisements, and/or heard radio
advertisements – all claiming that Wendy's food had zero trans fat.[50]   Other
customers may have understood that Wendy's was simply using different cooking oil
which resulted in "healthier" fries. In these cases, it would be important to analyze

---

[48] It is my understanding that drive-through customers could have been exposed to trans-fat information
after their purchase as trans-fat information was printed on take-out bags. Deposition transcript of Lori
Estrada, May 6, 2008, at 34.

[49] I understand that only french fry cartons were labeled with "0g Trans Fat" from October 2006 through
April 2007. (Deposition transcript of Lori Estrada, May 6, 2008, at 156.) Additionally, I understand that
the timing of the introduction of this packaging may have differed across locations. (Deposition transcript
of Lori Estrada, May 6, 2008, at 37, 156.) Furthermore, this packaging likely would have been observed by
customers only after their purchase. Thus, to the extent that the packaging was the only source of
information considered by a customer, trans-fat representations could not have been a factor in that
individual's initial purchase decision.

[50] Deposition transcript of Adam Jernow, May 7, 2008, at 116-22. Mr. Jernow thinks the first time he gave
any thought to the amount of trans fat in Wendy's food was "probably" after he heard a radio
advertisement. When pressed for additional details, Mr. Jernow stated that he "[does not] think it was a
news item..." He cannot remember if he heard a radio advertisement or read a print advertisement; it was
just an impression he formed prior to eating at Wendy's in June of 2006. (Deposition transcript of Adam
Jernow, May 7, 2008, at 115-6.) Ms. McLawrence does not remember when in 2006 she first heard of
trans fat. She claims she heard a radio announcement there was going to be zero trans fat used in Wendy's
fried food products, but she does not know if she heard this as an advertisement or a news item, nor what
station she heard it on. (Deposition transcript of Leah McLawrence, May 7, 2008, at 69-71.)

*Confidential- Subject to Protective Order*

the difference in the expected trans-fat content versus the actual amount ingested to assess any impact and economic injury.[51]

37. Differences among the Class members would result in different perceptions about the presence of trans fat in Wendy's french fries and different values associated with a claimed price premium.

   a. A customer that had no expectation of a reduction in trans-fat levels in Wendy's french fries did not pay a price premium to purchase the product – as a consumer's willingness to pay for a product reflects their knowledge about the product's features.

   b. A customer that purchased with the belief that Wendy's french fries had lower levels of trans fat compared to the competition would not have been harmed and would not have unjustly enriched Wendy's.[52]

   c. A customer that purchased with the belief that Wendy's french fries had lower levels of trans fat compared to previous levels would not have been harmed and would not have unjustly enriched Wendy's.

38. Thus, individualized inquiry regarding putative Class members' awareness of Wendy's trans fat representations would be necessary to determine which individual Class members, if any, paid a price premium, were harmed, and/or unjustly enriched Wendy's.

---

[51] In many cases this would likely be a *de minimis* difference or no difference at all.

[52] I understand that during certain periods within the proposed Class period, the trans-fat levels in Wendy's french fries were lower than those of McDonald's and Burger King. (Bruce Horovitz "McDonald's Tinkers with Beloved Fries," Jan. 30, 2007, at WEN-039160; "Are Fast-Food Fries Trans-Fat Free?" Consumer Reports, Dec. 2007, at WENDYS TRANS-FAT-0027.) It appears that from August 2006 through some point between January 2007 and August 2007, Wendy's french fries contained less trans fat per serving than McDonald's french fries. (*See* Dave Carpenter, "McDonald's Readies Trans-Fat-Free Oil," Associated Press, Jan. 29, 2007; Center for Science in the Public Interest, "Lab Tests Show McDonald's Fries are virtually Trans-Fat-Free in the Big Apple!" Aug. 2007 available at http://www.cspinet.org/new/200708021.html.) It also appears that through at least 2008 Wendy's fries contained less trans fat per serving than Burger King french fries. (*See* "Burger King Plans to Dump Trans Fats by 2008," Associated Press, Feb. 1, 2007.)

*Confidential- Subject to Protective Order*

**B. Individualized Inquiry is Required to Establish Different Customer Preferences Regarding Trans-Fat Levels**

39. Awareness of the trans-fat representations, absent other factors, would not be sufficient to assess whether a customer paid a price premium, was harmed, and/or unjustly enriched Wendy's. Such an assessment would require an examination of a customer's preference for lower trans-fat french fries. If it were found that a customer had no preference for lower trans-fat french fries, it would be an indication that other factors were likely the basis for the customer's purchase decision.[53]

40. Generally, product and feature preferences vary across groups of customers. Customer surveys include different demographics (such as income levels, age, and gender) which can be indicative of preferences and other determinants of purchasing patterns.[54] Like other products and features, preference for lower trans-fat foods varies by age and income.

   a. A 2005 Private Label Buyer study showed that knowledge and concern about trans fats varied widely by income level and age.[55] The study reported that older and wealthier consumers were more concerned with and were more knowledgeable about health and trans-fat issues.

---

[53] Theoretically, any customer might voice the preference that a lower trans-fat content would be desirable; however, an analysis of demographic information and purchasing behavior would be an important indicator of a customer's actual preferences. Often individuals will voice a preference for an additional product feature, but not change their purchasing patterns as features are introduced and/or removed. For example, despite the potential interest in fruit cups as part of "combo" meals, customers did not choose this healthier option, and after nine months it was removed by Wendy's. *See* "What's Tops in Fast Food? Hint: It's Not Salad," Associated Press, Dec. 13, 2005, available at http://www.msnbc.msn .com/id/10454311/.

[54] Age category of Class members could be separated into: below 15; 15-18; 19-24; 25-34; 35-44; 45-54; 55-64; over 65. Income levels could be: below $30,000; $30,001-$60,000; $60,001-$90,000; $90,001-$125,000; over $125,000.

[55] Jill Bruss, "'Translator Please' Shoppers speak out on trans-fats—they don't necessarily know what they are, but they're concerned," Private Label Buyer, Mar. 1, 2005.

*Confidential- Subject to Protective Order*

    b. A survey conducted by QSR Magazine showed that thirty-nine percent of QSR customers aged sixty-five and older paid "particular attention" to trans fat, compared to only eighteen percent of customers aged eighteen to thirty-four.[56]

41. In addition, individualized inquiry would reveal actual preferences regarding trans-fat consumption. An analysis of the purchasing patterns of individuals would be informative of trans-fat preferences.

    a. Individual inquiry into purchasing patterns could reveal whether a putative Class member was a new Wendy's customer after Wendy's initial trans-fat announcements. Identifying putative Class members who were not french fry customers at Wendy's prior to the trans-fat announcements and became customers after the trans-fat announcements could be a surrogate for customers that considered the trans-fat change to be an important determinant of the purchasing decision.

    b. Individual inquiry could identify how the purchasing patterns of customers changed after subsequent disclosures concerning the level of trans fats in Wendy's french fries, or after other events, such as the initiation of this litigation. For example, Mr. Jernow continued to eat french fries at Wendy's after the commencement of this litigation, which would appear to indicate that levels of trans fat provided little-to-no influence over his french fry purchasing decisions.[57]

    c. Individual inquiry could identify customers who purchased french fries at McDonald's, Burger King, and Wendy's during the Class period, demonstrating a preference for fries generally, but not low trans-fat fries. For example, while Ms. McLawrence claimed she tried to avoid trans fat by eating at home more often, she continued to frequent McDonald's and Burger King during the proposed Class period even after she claimed to have learned that Wendy's had lowered the trans-fat content of its french fries.[58] Similarly, Mr. Jernow consumed french fries at McDonald's and Burger King throughout the proposed Class period.[59]

    d. Individual inquiry into the other food purchased by a customer could be informative of trans-fat preference. For example, a customer purchasing a Chicken Caesar salad with french fries may have a greater preference for

---

[56] QSR Magazine, Survey of Consumer Attitudes and Preferences in Quick-Service Restaurants, Jun. 2008, available at http://www.qsrmagazine.com/articles/features/116/consumer_charts/33/over_65 and http://www.qsrmagazine.com/articles/features/116/consumer_charts/33/18-34.

[57] Deposition transcript of Adam Jernow, May 7, 2008, at 65-66. In addition, Mr. Jernow did not mitigate his claimed damages by continuing to purchase Wendy's french fries after the commencement of this litigation.

[58] Mrs. McLawrence claims that she "did not know that there was trans fat in the french fries." Deposition transcript of Leah McLawrence, May 8, 2008, at 74.

[59] Deposition transcript of Adam Jernow, May 7, 2008, at 100-102.

*Confidential- Subject to Protective Order*

consuming fewer trans fats than a customer purchasing french fries with a Baconater Burger with six strips of bacon or a Triple Burger with cheese.[60] Ms. McLawrence testified that there was not one particular type or size hamburger she consistently would order at Wendy's; sometimes she ordered a single, sometimes a double, and sometimes a bacon cheeseburger.[61]

### C. Individualized Inquiry Is Required To Establish Other Factors Important To Purchase Decisions

42. In the absence of a demonstrable and unambiguous customer preference for lower trans-fat french fries, individual inquiry would be required to examine other factors contributing to the purchase decision. To the extent that individual inquiry could show that other factors, and not the trans-fat levels of the french fries, formed the basis for the purchase decision, then one could conclude that the customer should not be considered a member of the proposed Class.

43. Additional examples of the factors one should investigate include, but are not limited to, the following:

   a. restaurant location;

   b. time of purchase (i.e., time of day);

   c. purchases during promotional events;

   d. manner of purchase (such as walk-in or drive-through); and

   e. whether the putative Class member was a Wendy's repeat customer.

44. Each of these factors would contribute to a customer's willingness to pay for the product. To the extent that these factors – independent of the trans-fat content of the

---

[60] One can also inquire if the customer was aware that these menu choices contained trans fats to make this judgment. For example, the Baconater Burger contains 2.5 grams of trans fat; the ¾ lb. Triple Burger with cheese contains 3.5 grams of trans fat; and the Chicken Caesar Salad contains 0.5 grams of trans fat. *See* Customized Menu Options, available at http://www.wendys.com/food/Nutrition.jsp.

[61] Deposition transcript of Leah McLawrence, May 8, 2008, at 54-5.

*Confidential- Subject to Protective Order*

french fries – were a primary motivation in the purchase decision and justified the price paid for the fries, the customer did not pay a price premium.

a. <u>Location</u>. The location of the purchase can serve as an indicator of preference. A purchase from an Interstate (or isolated) location may demonstrate that the customer was more interested in quick service or convenience than the trans-fat content of their food.[62] For instance, Mr. Jernow indicated that he chose to eat at Wendy's because it was "on the closest corner to Cornell" while he attended school.[63]

b. <u>Time of Day</u>. Purchase time also may reveal preferences. Late night purchasers may be less interested in caloric and/or trans-fat content than those eating during regular meal-time hours.[64]

c. <u>Promotional Events</u>. Whether the potential Class member purchased during a major promotional event may also serve as a surrogate for alternative factors influencing the purchasing decision. Over the proposed Class period, Wendy's engaged in a number of promotions that may have driven the purchase decisions of customers independent of trans-fat content.[65] French fry purchases during these promotions may indicate no premium was paid by the customer. For example, during the Rhapsody giveaway, customers interested in consuming a

---

[62] Some studies have shown that prices at QSR franchised locations near highways have a greater price difference from company-owned stores, demonstrating a premium paid for this convenience. *See* Ater, Itai and Oren Rigibi, "Price Advertising in Franchised Chains: The Case of McDonald's Dollar Menu," Nov., 2007.

[63] Deposition transcript of Adam Jernow, May 7, 2008, at 64.

[64] Taco Bell, Wendy's and Burger King all have extended hours, and many McDonald's locations are open 24 hours. The hours between 9 p.m. and midnight account for 7 percent of all QSR sales and target 18- to 34-year-olds. Even though late night dining has a broad application to different people, the focus is on young people who are looking to "extend the night." The top foods ordered between 9 p.m. and midnight are carbonated soft drinks, burgers, and fries; other popular items include ice cream, tacos, fried chicken sandwiches, and pizza. (Michelle Avery "Extended Hours Grow More Common" QSR Trends available at http://www.qsrweb.com/article_printable.php?id=9463&page=143.) A key Wendy's initiative in 1996 was the extension of the hours of operation to include late-night dining (i.e. after 10:00 pm). The late-night service sales grew to 10 percent of overall sales by 1999 (Hoover's Profile for Wendy's International, available at http://www.answers.com/topic/wendy-s-international?cat=biz-fin.)

[65] These promotional events included, but are not limited to: various kid's meal special events such as Charlotte's Web (December 2006 – January 2007) and Scooby Doo (September 2007); new product introductions such as Wendy's new Vanilla Frosty which was tied to a promotional contest to win a Nintendo Wii™ video game system (May 2007); the "Build Wendy's New Burger" contest, giving away 72,000 hamburgers and gift cards (September 2007); and product promotions such as Wendy's Rhapsody partnership to give away 100 million free digital songs to consumers who bought a combination meal between November 21, 2007 and December 30, 2007. *See* Wendy's Power Point Presentation, "Wendy's 2007 National Media Calendar 1.18.08 Rev23 – Final.ppt," at WEN-115302; Wendy's Press Release, May 21, 2007, available at http://www.wendys-invest.com/ne/wen052107frostyfloat.php; Wendy's Press Release, Sept. 7, 2007, available at http://www.wendys-invest.com/ne/wen090707.php; Wendy's Press Release, Nov. 12, 2007, available at http://www.wendys-invest.com/ne/wen111207.php.

*Confidential- Subject to Protective Order*

hamburger and drink may have upgraded to a combination meal with fries simply to receive a free digital song—thus buying fries with no demonstrated preference for their trans-fat content.

d. <u>Walk-In vs. Drive-Through</u>. Manner of purchase may reveal preferences. Drive-through customers may be relatively more interested in speed of service than trans-fat content.[66]

e. <u>Repeat Customer</u>. Whether the potential Class member is a significant repeat buyer from Wendy's would be relevant. ███████████████████████████████████████████████[67] If such a customer did not change their purchasing patterns before, during, or after the trans-fat announcements, this would demonstrate that alternative factors (not the level of trans fat) influenced their purchasing decisions.

45. All of the above factors would need to be individually evaluated to determine if a customer purchased french fries (and potentially paid a premium for those french fries) based upon factors unrelated to trans fat content.

## X.   THE CLASS PERIOD SHOULD BE CONSISTENT WITH PLAINTIFFS' CLAIMS

46. From an economic perspective, the appropriate Class period should be consistent with Plaintiffs' claims regarding Wendy's alleged wrongful conduct and the alleged harm suffered by the Class members. In recommending that the Class period extend through the present, Plaintiffs have failed to consider the impact of any subsequent disclosures regarding the trans-fat content of Wendy's french fries after June 8, 2006, or changes to the preparation process.[68]

---

[66] It is my understanding drive-through sales at many locations comprise more than fifty percent of total sales. Fred Minnick, "Expanding the shrinking drive-thru," QSR Web, Jan. 25, 2006, available at http://www.qsrweb.com/article.php?id=686.

[67] Wendy's PowerPoint Presentation, "Competitive and Franchise Pricing Survey Analysis." Triunal Meeting, Presented by Casey Minton, Jun. 21, 2006, at WEN-011901.

[68] *See* Class Certification Memorandum, at 5. Despite awareness of their existence (*See for example,* Second Amended Complaint, at 6-7, discussing the Consumer Reports' disclosures), the Plaintiffs' motion fails to address or consider any of the subsequent disclosures or changes to the preparation process as they relate to the proposed Class period.

*Confidential- Subject to Protective Order*

47. For example, articles appearing in the press concerning the preparation process and

    trans-fat content of Wendy's french fries occurred at least on the following dates and

    in the following publications.

    a. June 8, 2006. On June 8, 2006, Wendy's announced it was switching to a new
       cooking oil to "significantly reduce" trans fat, and that trans-fat levels in french
       fries would range from zero to 0.5 grams.[69] This story was included in both a
       Wendy's press release and later appeared in print publications (e.g., *USA Today*
       and the *New York Daily News*).[70]

    b. August 24, 2006. On August 24, 2006, Wendy's announced that the move to new
       cooking oil with zero grams of trans fat was complete.[71] On August 25, 2006,
       various newspapers such as the *Boston Globe*, the *Tampa Tribune*, and the *Miami
       Herald* reported on Wendy's change in cooking oil.[72]

    c. November 2006. In November 2006, *Consumer Reports* published an article
       stating the average trans fat per serving of Wendy's french fries was 2.5 grams.[73]
       Various news organizations reported the Consumer Reports' findings in early
       November and December 2006. These follow-on reports were included in, but

---

[69] Wendy's Press Release, Jun. 8, 2006, available at http://www.wendys-invest.com/ne/wen060806transfat
.php.

[70] Bruce Horovitz, "Wendy's Will Be 1st Fast Foodie with Healthier Oil," USA Today, Jun. 8, 2006,
available at http://www.usatoday.com/money/industries/food/2006-06-08-wendys-usat_x.htm. Pascale Le
Draoulec, "Trans Fat R.I.P.; Thanks to Wendy's new policy, these fries aren't so bad for you after all,"
*New York Daily News*, Jul. 26, 2006. *USA Today* has a paid daily circulation of over 2.2 million. *The New
York Daily News* has a paid circulation of over 700,000. Editor and Publisher, "Top 25 Daily Newspapers
in Latest FAS-FAX," Apr. 28, 2008.

[71] Wendy's Press Release Aug. 24, 2006, available at http://www.wendys-invest.com/ne/wen082406mile
stone.php. Lori Estrada confirmed that in June 2006, Wendy's began a switch to non-hydrogenated oil for
in-store frying which was completed on August 24, 2006. Deposition transcript of Lori Estrada, May 6,
2008, at 65.

[72] "Wendy's Restaurants Drop Trans Fat from Cooking Oil – Switch Is A First for Major Chains," Aug. 25,
2006, available at http://www.boston.com/business/globe/articles/2006/08/25/wendys_restaurants_drop_
trans_fats_from_cooking_oil/. Wire Report, "Wendy's Has No Trans Fat," *Tampa Tribune*, Aug. 25, 2006.
Wire Report, "Wendy's Switches to Healthier Oil," *The Miami Herald*, Aug. 25, 2006. The *Boston Globe*
has a paid daily circulation of approximately 350,000. The *Tampa Tribune* has a paid daily circulation of
approximately 400,000. The *Miami Herald* has a paid daily circulation of approximately 400,000. Editor
and Publisher, "Top 25 Daily Newspapers in Latest FAS-FAX," Apr. 28, 2008; Top 100 Newspapers in the
United States, as of Mar. 31, 2006, available at http://www.infoplease.com/ipea/A0004420.html.

[73] "CR Tests Find Trans Fats in Wendy's Fries," Nov. 2006, available at http://www.consumerreports
.org/cro/food/news/november-2006/cr-tests-find-trans-fats-in-wendys-fries-11-06/overview/0611_wendy-
fries.htm. *Consumer Reports* has a monthly circulation of approximately 4,000,000. MDS Top Circulation
Publications, available at http://www.mdsconnect.com/topcirculation.htm.

*Confidential- Subject to Protective Order*

not limited to, the *Wall Street Journal, BrandWeek, Nation's Restaurant News*, and various local television stations.[74]

    d. <u>December 5, 2006</u>. On December 5, 2006, it was announced that New York became the first city to mandate healthier french fries.[75] The Health Commissioner explained that restaurants would need to switch frying oils by July 2007, but have until July 2008 to remove trans fat entirely as suppliers and recipes also would likely need to change.[76]

    e. <u>January 2007</u>. In January 2007, Cox News Service reported that although Wendy's had removed trans fat from its cooking oil in 2006, it was still working to completely eliminate trans fat from supplier oil.[77]

    f. <u>July 2007</u>. In July 2007, Cavendish, the only french fry supplier used by Wendy's in New York (over the relevant period) began its conversion to non-hydrogenated oil; this transition took "a few months" to fully implement.[78]

48. To the extent new information became available to the public regarding the trans-fat content of Wendy's french fries, or to the extent Wendy's cooking oil conversion brought the trans fat content of Wendy's french fries in line with information

---

[74] For example, Nation's Restaurant News wrote a story on November 3, 2006. *See* "Consumer Reports Disputes Wendy's claim on trans-fat content in fries," Nation's Restaurant News, Nov. 13, 2006, available at http://www.nrn.com/breakingNews.aspx?id=326888. *See also* "Consumer Report 'Fried' over Trans Fat at Wendy's," Brandweek.com, Nov. 6, 2006. "Wendy's Fat Content is Disputed by Tests," Wall Street Journal Abstracts, Nov. 3, 2006. The *Wall Street Journal* has a daily circulation of approximately 2,000,000. (Editor and Publisher, "Top 25 Daily Newspapers in Latest FAS-FAX," Apr. 28, 2008) *BrandWeek* has over 100,000 unique visitors each month. (BrandWeek Publication Information, available at http://www.biotechmedia.com/y2004Brandweek.html)  *Nation's Restaurant News* has a weekly readership of approximately 130,000.

[75] Sarah Kugler, "NYC Board of health poised Tuesday to prohibit unhealthy trans fats in restaurants," Associated Press, Dec. 5, 2006.

[76] This regulation also would serve to inform consumers that changing cooking oils was only one part of the process to reduce trans fats in foods.

[77] Cox News Service, General News Item, Jan. 7, 2007. Cox News Service has a reach that includes the Cox Washington Bureau and the 650 worldwide subscribers of the New York Times News Service, which includes over 1,000 newspapers and magazines in the United States and in more than 80 countries worldwide. The Cox New Service alone has a weekday circulation of 1.2 million. (*See* Cox Newspapers Company Profile, available at http://www.coxnews.com/html/company.html.) Excluding the hundreds of outlets subscribing to the New York Times Wire Service, the New York Times News Service has a daily circulation of over 2.34 million. (*See* The New York Times Media Group Circulation, available at http://www.nytco.com/company/business_units/new_york_times_media_group.html; The New York Times Media Group Circulation - New England available at http://www.nytco.com/company/business_units/new_england_media_group.html.)

[78] Deposition transcript of Lori Estrada, May 6, 2008, at 99.

*Confidential- Subject to Protective Order*

disseminated to the public, the period of time over which Class members could claim economic harm is truncated. In addition, many proposed Class members may have been differently impacted by these subsequent disclosures and preparation process changes. Hence, individual inquiry is required to properly measure the extent to which Wendy's alleged wrongful conduct influenced or harmed putative Class members.

## XI.  **SUMMARY**

49. Throughout my declaration I have demonstrated that the wide variation in french fry prices (a) among Wendy's company-owned and franchised stores and (b) for different french fry products requires individualized inquiry to establish the existence and magnitude of any claimed price premium with respect to these products. Additionally, I have described the purchase decisions of the proposed Class members which are not accounted for by class-wide observable characteristics. A customer's awareness of Wendy's trans-fat claims, the customer's preference for low trans-fat foods, and other considerations that impact purchase decisions such as convenience, time of purchase, and interest in on-going promotions would be relevant inquires to determine if a purchaser should be part of the proposed Class. Individualized inquiry is required to assess the impact of Wendy's alleged wrongful conduct and to measure the alleged harm to each proposed Class member.

50. Finally, the most appropriate Class period is one consistent with Plaintiffs' claims regarding Wendy's alleged wrongful conduct and the alleged harm suffered by the proposed Class members. Plaintiffs have failed to consider the impact of any

*Confidential- Subject to Protective Order*

subsequent disclosures regarding the trans-fat content of Wendy's french fries after June 8, 2006, or changes to the preparation process.

51. A summary of the factors I have identified that should be investigated on an individualized basis is contained in **Exhibit 4**.[79]

\* \* \* \* \* \*

52. My analyses and opinions contained in this declaration are based upon the information reasonably available to date. I reserve the ability to supplement my opinion should additional documents produced and additional depositions taken in this matter.

Keith R. Ugone, Ph.D.
June 18, 2008

---

[79] Based upon the deposition testimony of the two named class members, and in combination with the factors I have identified in my declaration that are important in the decision whether to certify the proposed class, I am of the opinion that from an economic perspective (a) Plaintiffs' claims are not typical of the claims of an appropriately defined Class and (b) the representative parties would not adequately protect the interests of the Class.

29

**Exhibit 1**



ANALYSIS GROUP
ECONOMIC, FINANCIAL and STRATEGY CONSULTANTS

Main 1 214 523 1400    Fax 1 214 523 1401    www.analysisgroup.com
2911 Turtle Creek Boulevard    Suite 600    Dallas, TX    75219

## KEITH R. UGONE, PH.D.
### Managing Principal

Phone: (214) 523-1405
Fax: (214) 523-1401
kugone@analysisgroup.com

Analysis Group, Inc.
2911 Turtle Creek Boulevard, Suite 600
Dallas, TX 75219

Keith R. Ugone has provided financial and economic consulting services in antitrust cases, breach of contract cases, business interruption cases, employment / loss of earnings cases, intellectual property cases, lender liability cases, and securities-related cases, among others. He specializes in the application of economic principles to complex business disputes, and is generally retained in cases requiring economic analyses and/or damages-related analyses. Damage models constructed or evaluated by Dr. Ugone have included as components revenue analyses, lost sales analyses, cost analyses, assessments of the capacity to produce additional units, assessments of profitability, the competitive business environment in which a damage claim is made, claimed lost profits, claimed lost value, and claimed reasonable royalties. During the course of Dr. Ugone's career, he has frequently evaluated lost profits and valuation-related damages using large databases of information and complex computer models. Dr. Ugone has also performed economic liability analyses in antitrust matters including defining relevant markets and assessing alleged anticompetitive behavior. Dr. Ugone has testified at trial and in deposition over 100 times.

Dr. Ugone has a PhD in Economics from Arizona State University, an MA in Economics from the University of Southern California, and a BA in Economics from the University of Notre Dame. He is a member of the American Economic Association, the American Statistical Association, the National Association of Forensic Economists, and the Western Economics Association.

## EDUCATION

| | |
|---|---|
| 1983 | Ph.D., Economics, Arizona State University. Areas of specialization: Microeconomics, Macroeconomics, Industrial Organization, Antitrust/Regulation, Econometrics. |
| 1979 | M.A., Economics, University of Southern California. |
| 1977 | B.A., Economics, University of Notre Dame. |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 - Present | Analysis Group, Dallas, Texas – Managing Principal. |
| 1985 – 2003 | PricewaterhouseCoopers LLP – Partner (Principal) 1992 – 2003; Senior Manager 1989 – 1992; Manager 1987 – 1989; Senior Consultant 1985 – 1987. Member of United States Admissions Committee (2003). Chairman of PricewaterhouseCoopers Leadership Forum Chairman (2000 – 2003). |
| 1983 – 1985 | California State University, Northridge - Assistant Professor/Lecturer in Department of Economics, Full-time: 1983 – 1985, Part-time: 1986 – 1992. |
| 1979 – 1983 | Arizona State University - Faculty Associate/Teaching Assistant in Department of Economics. |
| 1977 – 1979 | Jet Propulsion Laboratory - Economic/Energy Analyst. |

## PROFESSIONAL AND BUSINESS AFFILIATIONS

American Economic Association

American Statistical Association

National Association of Forensic Economists

Western Economics Association

## LITIGATION CONSULTING EXPERIENCE (by Nature of Suit)

### Securities:  10b-5 / Section 11 Cases

- Evaluated plaintiffs' damages claim in a shareholder suit relating to the manufacturer of decoding equipment used in the wireless cable industry.  Analysis demonstrated plaintiffs' financial expert did not consider market speculation related to the wireless cable industry nor defendant's higher-than-expected earnings when calculating claimed damages.  Additional errors included assuming stock price increases unrelated to plaintiffs' allegations and on "no announcement days" represented damages.

- Evaluated a claim of damages against a major investment banking/underwriting firm relating to an aborted initial public offering in the temporary staffing industry.  Analysis demonstrated methodological and conceptual errors in plaintiff's econometrically-based claim that the projected post-IPO stock price of the company justified proceeding with the IPO.  Also evaluated various components of plaintiff's damages claim, including the profitability of plaintiff's business, projected use of funds raised, ownership percentages in the company, and the funds that would have inured to the original owners of the company.

- Evaluated plaintiffs' damage claims in a shareholder suit involving an international airline carrier.  At issue were alleged misrepresentations concerning the airline's ability to reduce its maintenance costs.  Demonstrated that the fifty percent decline in the company's stock price over a one-month period was for reasons unrelated to corrective disclosures concerning maintenance costs.  Also reconstructed plaintiffs' trading history, comparing the trading pattern to public announcements concerning the airline, and demonstrating a trading pattern inconsistent with plaintiffs' theory of reliance on the alleged misrepresentations.

- Analyzed the financial exposure to a company acquiring a computer/networking firm facing a shareholder suit.  Issues relevant to the underlying securities litigation included acquisition rumors, public announcements concerning new products, merger activity in the industry, and the target company's dependence on a single large customer.

- Assisted counsel during settlement discussions in a shareholder litigation in the health care industry.  At issue were allegations the company had failed to disclose the true scope of certain alleged fraudulent practices in its psychiatric facilities.  Analyses included assisting counsel understand plaintiffs' damages calculations, demonstrating that plaintiffs' expert had no justification for the dates of the damage period, that the risks the company faced were fully revealed to the market place, and plaintiffs' financial expert ignored "corrective disclosures" to the market.  Alternative damages calculations were performed to assist in the settlement negotiations.

- Evaluated plaintiff's damage claim in a biotechnology securities litigation matter relating to an autolymphocyte therapy.  At issue was whether the company had revealed to the investing public concerns the medical community had with the therapy.  Analyses included an assessment of the length of the damage period, company-specific information available to the market, market-related impacts on the company's stock price, and the post-IPO stock price performance of similar entities.

- Performed an "event study" and/or calculated damages in various securities litigation cases involving firms in industries such as: airlines, biotechnology, computer software, commodities, banking, real estate development, life insurance, entertainment, computer printers, health care, medical equipment, hotels, information technology services, workmen's compensation insurance, computer hardware, camera and photo finishing, intelligent disk drives, market research, trucking, temporary staffing, real estate investment trusts, computer networking, specialty stores, skilled nursing facilities, wireless cable encoding devices, the provision of software computer services to insurance companies, and the provision of professional services to power plants and large scale industrial facilities. Analyses included development of an appropriate peer group and isolation of economy-wide, industry-specific, and company-specific factors impacting the particular firm's stock price. Company-specific events often included unfavorable news announcements unrelated to the alleged misrepresentations and the ending of potential takeover bids. Also involved was a comparison of the firm's actual stock price to its "true value" line, the construction of a volume matrix to track ins-and-outs traders and retention shareholders, and an evaluation of damages under Section 10b-5 and Section 11 claims.

## Securities: Merger/Takeover Related Cases

- Evaluated plaintiffs' damages claim relating to a merger in the banking industry. At issue was whether material adverse changes regarding loan loss reserves had occurred but were not disclosed. Analyzed whether the complained of events were related to conditions and circumstances in the banking industry. Also analyzed the value of alternative offers for the target bank and the pre-merger volatility in the acquiring bank's stock price.

- Evaluated plaintiffs' claimed damages in a breach of contract matter involving the aborted sale of assisted living facilities. Analyzed current trends in the assisted living industry, the financial condition of the target company, the projected financial results of certain to-be-constructed properties, and the target company's performance relative to projections. Also at issue was whether a material adverse change had occurred in the target company's operations and business. Lost profit damages, interest-related damages, lost contract fees, and diminution-in-value damages were evaluated.

- Evaluated plaintiffs' claim of damages in a merger/acquisition-for-stock litigation in the information technology services industry. At issue was whether material adverse changes had occurred in the business condition of the acquiring company prior to the closing of the merger. Damages issues included investigating the nature of the agreed upon warranties and representations contained in the merger agreement, the stock price performance of similarly-situated firms, the length of the alleged damage period, the appropriate length of certain event windows, industry downturns, and the failure to account for the proper mitigation of damages.

- Analyzed a major entertainment company's stock price movement to determine the takeover premium paid by an acquiring company. Involved was quantifying the impact of takeover rumors prior to the takeover announcement to isolate that portion of the company's pre-acquisition increase in stock price due to takeover speculation as opposed to general industry trends.

- Evaluated plaintiffs' claims of misrepresentations and subsequent damages in a merger/acquisition-for-stock litigation in the electronic label industry. Demonstrated the post-merger decline in the acquiring company's stock price was not related to disclosures concerning the alleged pre-merger misrepresentations. Also demonstrated plaintiffs' damage claim failed to recognize industry-related reasons for the decline in the acquiring company's stock price. Re-evaluated damages by analyzing a likely outcome that plaintiffs would have negotiated and received additional shares rather than abort the transaction.

- Analyzed the impact of a "Rights Plan" ("poison pill") announcement by a corporation's Board of Directors on the corporation's stock price. Involved was the development of an appropriate peer group and a comparison of the company's stock price behavior to that of the peer group. Purpose of the analysis was to evaluate whether the "poison pill" announcement negatively impacted the company's stock price.

- Evaluated the damages allegedly suffered by the owner of a maternity clothing retail store chain terminated after selling 60 percent ownership to venture capitalists. At issue was the value of shares of stock purchased by the company from the owner upon the owner's termination. Subsequent to the owner's termination, the company went public and was eventually taken over by another company. Analysis also included determining the terminated owner's actual stock sales pattern on stock held post-termination.

- Served as financial advisor to a Special Litigation Committee ("SLC") investigating a shareholder approved merger vote in the telecommunications industry. The merger was not consummated, but the vote triggered the acceleration of vesting of options owned by the officers and directors of the target company. Assisted the SLC in analyzing the acceleration of options and various alternative settlement strategies.

## Securities/Commodities: Other Cases

- Evaluated the spot price of a base metal in a major commodities-related market manipulation matter. Developed an econometric model to explain the spot price movements of the base metal in an unimpacted period. Used the econometric model to evaluate what the spot price of the base metal would have been in the absence of the alleged manipulation.

- Calculated short-swing trading profits under Section 16(b) of the Securities Exchange Act of 1934 related to the stock trading activities of an officer of a long distance telecommunications company. Issues analyzed included allocating stock purchases to stock sales of differing numbers of shares and accounting for a 3-for-1 reverse stock split during the period under consideration.

- Evaluated damages in an alleged lack of suitability, lack of supervision, and failure to execute matter in the securities industry. At issue was an investment strategy of selling short the same stock in which a restricted long position was also held. Demonstrated errors in plaintiff's damage claim, including the failure to recognize that the financial objectives stated at the time of the development of the investment strategy were in fact met.

## Antitrust: Monopolization Cases

- Evaluated plaintiff's claim of antitrust injury in the markets for orthodontic brackets and orthodontic services allegedly due to the advertising guidelines promulgated by a national orthodontic trade association. Analysis demonstrated the advertising guidelines were efficiency enhancing (by lowering consumer search costs), promoted competition, and did not stifle innovation in the relevant markets. Also empirically demonstrated that legitimate advertising through a variety of media was not impacted by the advertising guidelines.

- Evaluated distributors' claims of past lost profits, future lost profits, and reductions in franchise values in a carbonated soft drink antitrust litigation. Defendants allegedly entered into a series of anti-competitive marketing agreements with retailers relative to the promotion and sale of national brand carbonated beverages. Analysis demonstrated plaintiffs' expert did not take into account the brand composition of plaintiffs' case sales, underestimated variable costs of distribution, did not adjust for increased competition from private-label brands and other drinks, and failed to account for the lack of advertising and other promotional support from the distributors' parent company.

- Evaluated the relevant market and the alleged harm to competition arising from certain deceptive practices in the standard setting process for subsea horizontal christmas trees. Demonstrated defendant's failure to reveal its patents prior to the acceptance of the design as the industry standard and while participating in the standard setting process conferred upon the defendant the ability to exclude competition and/or raise prices. Also opined that defendant's failure to offer licenses on a reasonable and non-discriminatory basis was exclusionary in nature.

- Analyzed the impact of a proposed merger of two insurance companies on the long term care and medicare supplement insurance markets in the state of Oklahoma. Evaluated whether the merger would substantially lessen competition or have a tendency to create a monopoly. Evaluated the number of competitors, the reasonable interchangeability of the insurance products offered, insurance company sizes, the ease of entry, the impact of regulation, and the ability of consumers to acquire price information in a low-cost manner.

- Analyzed the alleged anticompetitive impact of an exclusive provider arrangement between a hospital and a group of anesthesiologists on the market for anesthesia services. Analyses included determining inpatient services market shares, anesthesia procedures market shares, and recent entry into the hospital service area. Also evaluated the damage claims being alleged by a group of Certified Registered Nurse Anesthetists.

- Evaluated antitrust liability in a monopolization claim involving non-prescription reading glasses. Analysis included defining the relevant market, identifying potential substitutes, evaluating entry and exit in the relevant market, and analyzing competition and market power issues.

- Using economic analysis, developed a theoretical economic model to explain the behavior of prices, output, and market shares for the dominant firm versus a group of smaller firms in a major telecommunications antitrust suit. The model served as the theoretical basis for the assumptions made in the damage quantification phase of the case.

- Conducted an economic analysis in a vertical non-price (advertising) restraint antitrust case dealing with tennis ball throwing machines. Analysis demonstrated the pro-competitive nature of the advertising restraint and that the termination of a non-complying dealer did not substantially reduce competition in the relevant market.

- Provided economic analyses and developed damage models and/or critiqued the opposition's damage model in various antitrust cases involving the following industries and/or markets: anesthesia services, printed circuit boards, carbonated soft drinks, telecommunications switching equipment, radio control model airplanes, local area networks, entertainment lighting, integrated casino bonusing software, medicare supplement/long term care insurance, commercial air conditioning units, disposable dust/mist respirators, immunodiagnostic tests, PBX systems, underground storage tanks, long distance telephone lines, tennis ball throwing machines, check processing readers/sorters, local television advertising, personal watercraft, automobile refinishing paint, Christian music, subsea Christmas trees, DRAM microcomputer chips, women's designer clothes, single point of contact telecommunication services, non-prescription reading glasses, and the provision of temporary electrical services to convention centers. Damage models were constructed or critiqued that involved lost sales analyses, incremental cost analyses, and assessments of capacity increases. Also investigated were economic forces external to the company that may have impacted the company's performance. Economic analyses included defining the relevant market, assessing the presence or absence of market power, evaluating whether a business activity was pro-competitive or anti-competitive, and/or evaluating the level of competition in a particular market.

## Antitrust:  Predatory Pricing/Price Discrimination Cases

- Evaluated the relevant product and geographic markets and impact on competition in a price discrimination case involving a manufacturer of lighting products and the prices charged to various distributors. Analyses included an investigation of the primary-line market (i.e., competition among manufacturers of lighting products) and the secondary-line market (i.e., competition among distributors). The impact on competition among the distributors of lighting products was investigated (and whether a substantial lessening of competition occurred) given the pricing policies and programs of the manufacturer.

- Reviewed the newly proposed pricing structure of a major magazine distributor to identify the efficiency enhancing attributes of the proposed pricing structure as well as potential discriminatory effects. The proposed pricing structure was a major change from industry practices and included per copy distribution fees and excess return fees.

- Evaluated the economic and damages-related claims made in a major price discrimination case in the pharmaceutical industry. At issue were the additional sales and profits that would have been made by grocery drug stores and retail drug chains in the absence of the alleged price discrimination.

- Conducted a review of the legal decisions in major predatory pricing cases to understand and summarize the courts' rulings on the appropriate measure of "cost" (from a legal perspective).

- Conducted various industry and firm-specific analyses in a major wholesale bread predatory pricing case. Bread industry studies included analyses of industry profitability rates, the changing size distribution of firms in the industry, and general trends in wholesale bread prices. Firm-specific studies included analyses of advertising rates, "cripple" (i.e., reject) rates, and "stale" (i.e., return) rates. Also involved was a critique of plaintiff's calculation of defendant's average variable cost of producing and distributing a loaf of bread.

- Calculated the average cost of servicing a three-yard bin of trash in a solid waste disposal predatory pricing case. Also included was an analysis of number of routes and bin pickups per route.

## Antitrust: Tying Cases

- Critiqued plaintiff's damage model in an alleged tying case dealing with automotive CAD/CAM design software (the "tying" good) and mainframe timesharing (the "tied" good). At issue was the total size of the market, the likelihood of entry, and the market share of the plaintiff in the absence of the alleged tie. Also investigated was the likelihood that design vendors would place the software on their own mainframes rather than timeshare.

- Analyzed the fast food point-of-sale ("POS") equipment and software industry in an alleged tying case. Demonstrated that a particular POS product was not a relevant market based on the reasonable interchangeability of various brands of fast food POS equipment from the perspective of the consumer (fast food restaurants). Also analyzed the degree of price competition, non-price competition, ease of entry, and relative market shares of fast food POS equipment manufacturers.

## Business Interruption/Interference Cases

- Evaluated plaintiffs' claimed damages in a tortuous interference, business disparagement, and breach of contract matter dealing with the licensing of testing equipment in the petrochemical piping inspection industry. Demonstrated plaintiff's expert committed errors relating to the duration of the contracts in dispute, system license fees, cost of replacement systems, pricing of services, utilization of the test systems, and mitigation of future damages.

- Evaluated plaintiff's claimed damages from a lost bid to retrofit a refinery in Pakistan. Analyzed plaintiff's allegations that defendants made untrue statements to the bid evaluation team concerning plaintiff's net worth, working capital, and profitability trends. Evaluated plaintiff's claimed damages using as a benchmark prior engineering projects completed by plaintiff.

- Calculated damages suffered by the owner of numerous mobile home parks due to the actions of a defendant in a case involving alleged intentional interference with contractual relations. Involved was an analysis of occupancy rates, a projection of park revenues in the absence of the alleged interference, and an analysis of mobile home park incremental profitability rates.

- Evaluated the damages sustained by a cosmetic company as a result of defective decorated glass containers being furnished for its new therapy products. Evaluated and/or verified product retrieval costs, retrieval program administration costs, customer goodwill replacement gift costs, waste disposal costs, and lost profits on the therapy products. The lost profits analysis included assessing the life cycle sales pattern of new cosmetic products introduced by the company.

- Evaluated damages relating to the introduction of a new popcorn product line in a business interruption dispute. The introduction of the new popcorn product line was aborted due to defective containers. Analyses undertaken included determining the cost of popcorn, the cost of popcorn bags, freight costs, as well as the projected revenues associated with popcorn sales. An assessment was also made of the supermarket outlets and territories in which the popcorn would have been sold.

- Evaluated plaintiffs' damages claim relating to the installation of an allegedly defective computer software system at an automobile dealership. Plaintiffs contended the software had defects adversely affecting the accounting system and day-to-day operations of the dealership, and submitted an "increased cost" damages claim. Analysis demonstrated plaintiffs' expert used an inappropriate methodology for measuring damages and submitted cost increases unrelated to the allegedly defective software.

- Provided deposition questions, economic analyses, and a critique of opposing economists' damage models in various business interruption cases resulting from (e.g.) fires, "lockouts", electrical outages, defective products, and/or injuries to key personnel. Businesses evaluated included a workout facility (gym), a pediatric practice, a balloon manufacturing plant, a radiology practice, and a packaging machine manufacturer.

## Intellectual Property: Patent Infringement and Patent-Related Cases

- Analyzed plaintiffs' lost profits and reasonable royalty damages in a patent infringement matter relating to offset head lacrosse sticks. Analysis included an assessment of plaintiffs' sales in the absence of the infringement, the distribution of the lost sales to the models that would have been sold in the absence of the infringement, and an incremental revenue and cost analysis. Also analyzed plaintiffs' competitors, pricing patterns, productive capacity, and geographic coverage in support of the lost profits claim. Reasonable royalty damages were assessed using the Georgia Pacific factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated plaintiff's lost profits claim in a patent infringement matter in the polyethylene film / landfill liner industry. At issue were lost profits on the patented liner and lost profits relating to a second liner. Analyzed the demand for the patented features of the liner, the existence of acceptable non-infringing alternatives, defendant's sales in the absence of the alleged infringement, the sales of competing suppliers, sales into the United States from a foreign plant, sales to a single large purchaser, and the plaintiff's ability to manufacture and market additional sales.

- Evaluated plaintiffs' claimed damages relating to an alleged failure by a law firm to properly file certain patent applications relating to a video processor recorder. Plaintiffs' business opportunities and licensing fees in the United States and Europe were allegedly lost due to the ensuing delays. Analyzed plaintiffs' causation linkages to claimed damages, length of the claimed damages period, forecasted units sold, forecasted market share, forecasted costs of production, and claimed licensing rate.

- Evaluated plaintiff's claims of lost profit, price erosion, and royalty damages in a patent infringement matter relating to degradable films for covering landfills. Analyses demonstrated plaintiff failed to rule out alternative reasons for the decline in sales, ignored plaintiff's lack of cost competitiveness with competing technologies, inappropriately assumed defendant would not have been in the market with a competing product, overstated price reduction damages by ignoring discounts granted by plaintiff in the normal course of business, and overstated the appropriate royalty rate by ignoring industry licenses and plaintiff's incremental profit rate.

- Evaluated damages in a patent infringement matter involving the manufacture and sale of a portable screening device used to separate fine material from construction debris. Plaintiff's expert purported to present an economic theory under which voluntary exchange would occur in a licensing transaction. Analysis revealed factors important to the licensing negotiation which would have led to a lower royalty were ignored: plaintiff was in financial distress, was getting pressure from its creditors, and had shut down its facilities for a period of time. Additionally, plaintiff was claiming damages relating to a diminished sales price of the company because of the alleged infringement. Analysis demonstrated an award of such damages in this circumstance would have led to a double-counting of damages.

- Evaluated damages in a patent infringement matter in the entertainment lighting industry. Plaintiff's lost luminaire rentals were evaluated by analyzing defendant's luminaire sales patterns, making adjustments for applications in which the plaintiff did not rent, and utilizing plaintiff's application share in those applications plaintiff did rent. Trade secret damages were evaluated with respect to one particular luminaire product. Royalty calculations were performed on defendant luminaire sales for which the plaintiff would not have made an equivalent rental. Defendant's antitrust counterclaim was also evaluated.

- Critiqued plaintiff's claimed damages in a litigation involving an eyesight-correcting surgical product used to treat presbyopia. Plaintiff alleged a law firm had failed to properly file certain international patent applications. Issues investigated included the size of the potential international market, the market penetration rate for this product, the impact of likely substitutes on consumer demand, and the impact of cross-country cultural differences on consumer demand.

- Evaluated lost profit damages in a patent infringement matter involving blasting hole drilling rigs. At issue were the lost profits stemming from lost rig sales and lost replacement part sales. With respect to lost rig sales, evaluated the model types, geographic sales coverage, and model prices of the entities involved. Also evaluated the capacity of the plaintiff to make the additional claimed sales. With respect to lost replacement part damages, evaluated the likely stream of replacement part sales over the life of the drilling rig. Royalty calculations were performed on sales not subject to lost profit calculations.

- Evaluated the impact on competition flowing from the use of "stealth" patents, blanket licenses, and confidential cross-licensing agreements in a standards setting environment in the DRAM microcomputer chip industry.

- Evaluated the royalties paid relative to royalties due in a licensing dispute concerning polypropylene. Also determined whether "overpayments" or "underpayments" were made, with and without consideration of interest on late payments. Finally, converted a lump sum royalty payment made on a subsequent licensing agreement into an equivalent running royalty rate over the life of the patent on the licensed product.

- Evaluated an opposing economist's assessment of the economic profits and market and firm elasticities of demand facing an alleged infringer in a patent infringement case involving voicemail technology. Also evaluated plaintiff's price erosion claim.

- Developed a computer model to determine total prejudgment interest in a major toy manufacturer's patent infringement suit. The model determined prejudgment interest under various alternative investment scenarios taking into account the taxability of the "but-for" royalties received and the taxability of the interest earned.

- Assessed plaintiff and/or defendant average and incremental profitability rates, capacity utilization rates, and product sales patterns in patent infringement cases involving disposable diaper adhesive tape, immunodiagnostic tests, motion detector lenses, and dual stage filtering and dispensing pumps.

## Intellectual Property:  Theft of Trade Secrets Cases

- Evaluated defendant's assessment of the incremental costs associated with a contract to provide integrated bonusing software to a casino.  The contract was allegedly won through the use of misappropriated trade secrets from the plaintiff.  At issue was the allocation of development and common costs to the contract in dispute.  Also evaluated plaintiff's antitrust counterclaim to defendant's patent infringement suit relating to the technology used as a foundation for the integrated bonusing software.

- Evaluated damages in a theft of trade secrets matter dealing with next generation switching equipment in the telecommunications industry.  At issue was the alleged theft of trade secrets when the defendant firm hired nine employees of the plaintiff firm.  Analyzed plaintiff's claimed inability to maintain its projected market share, the alleged accelerated entry of the defendant firm into the next generation switching equipment market, disgorgement measures of damages, and reasonable royalty measures of damages.

- Evaluated damages suffered by a plaintiff in the business of installing systems delivering ultra-high purity air, water, gas and chemicals to companies manufacturing integrated circuits.  Plaintiff alleged a former managerial employee breached his fiduciary duty by engaging in wrongful use of trade secrets, wrongful solicitation of employees and customers, and unfair competition with the original employer.  Analysis involved estimating the lost sales and lost profits to the original employer by estimating the number of bid opportunities missed because of the alleged actions of the former employee, adjusting for changing industry conditions.

- Analyzed damages in a theft of trade secrets matter in the drilling bit industry.  Dispute arose when one firm hired employees of a competitor working on an "anti-whirl" bit design.  Analysis included compiling a database of bits in dispute, determining lost revenues under various settlement scenarios, and calculating incremental profits.

- Critiqued plaintiff's damage model in a trade secrets case in the printed circuit board industry.  Plaintiff was claiming lost profits due to the misappropriation of trade secrets through defendant's hiring of four key management personnel from the plaintiff company.  Issues evaluated included the appropriateness of the "proxy/yardstick" approach undertaken to estimate lost revenues, and the incremental profit rates used to translate lost revenues into lost profits.

- Analyzed plaintiff's lost profits and defendant's damages counterclaim in a trade secrets case dealing with factoring software sold to the banking industry.  A database of plaintiff's sales records was created to evaluate plaintiff's claims of lost licensing fees, lost initial balance payments, and lost on-going payments.  A reasonable royalty approach was undertaken to quantify damages.

- Analyzed the impact of the theft of trade secrets and/or customer lists in cases involving building maintenance, automobile stereo and cellular phone service, the provision of insurance products to bank account customers, the design of multilateral oil well junctions, golf course maintenance products, and integrated casino bonusing software.

## Intellectual Property:  Copyright/Trademark/Trade Dress Infringement Cases

- Critiqued plaintiff's damage claim in a matter involving alleged tortious interference with business relations and allegations of trade dress infringement.  At issue was the projected sales and profitability of plaintiff's tape dispensing machines during a period of alleged tortious interference by the defendant and plaintiff's simultaneous alleged trade dress infringement.

- Analyzed the lost profits of a plaintiff in a trademark infringement case involving a law enforcement product sold through a mail-order catalog.  Also analyzed the profits of the alleged infringer and the cost of remedial advertising.

- Assessed damages resulting from the alleged infringement of copyrighted training manuals.  Analysis included identifying the corporate clients of the plaintiff and defendant firms and the reasons for customer switching unrelated to the use of the proprietary training manuals.

**Breach of Contract Cases**

- Evaluated plaintiffs' claimed damages in a breach of contract matter involving the sale of certain minority interests in a National Basketball Association team. At issue were plaintiffs' tag-along rights whereby limited partnership interests could be included in any sale by the general partner on the same terms and conditions. Damages were calculated as the difference between the formulaic value of the minority interests versus the market value of the minority interests when sold separately. Discounts for lack of control and reduced marketability were analyzed.

- Evaluated plaintiff's damages claim relating to a NASCAR racing team sponsorship agreement. Plaintiff contended the Internet service provider sponsor interfered with the racing team's ability to sell advertising banners that were part of the sponsorship agreement. Analyses included assessing the appropriate methodology for valuing a NASCAR race team and assessing comparable transactions. Also analyzed the financial performance of the race team, the economic terms of the sponsorship agreement, and the risks associated with a barter arrangement.

- Developed a delayed theory of lost profits damage claim on behalf of an information technology firm in a breach of contract matter dealing with the failure of a recruiting firm to fulfill its executive search obligations. Plaintiffs' hiring strategies were delayed due to the breach. Analysis included an assessment of expected vs. delayed revenues and the associated incremental costs and profits.

- Evaluated plaintiff's damages claim concerning the alleged failure of a call center to properly process inquiries relating to the newspaper and television marketing of a collectible doll in the likeness of a recently deceased public figure. Analyzed advertising expenditures, response rates across cities, major news announcements related to the marketing of such merchandise, and contributing problems caused by plaintiff's actions. Estimated damages by comparing sales in an unimpacted period with sales in the alleged impacted period.

- Evaluated plaintiffs' damages claim relating to the underwriting and loan servicing of subprime automobile loans. Plaintiffs' contended the servicing company did not properly administer the portfolio of subprime automobile loans thereby causing excessive loan losses. Analysis demonstrated that plaintiffs' financial experts failed to take into account alternative reasons for plaintiffs' performance. Analysis of plaintiffs' loan volume, interest income, loan loss rate, and deteriorating industry conditions also demonstrated that plaintiffs' business plan did not provide a reasonable basis from which to calculate claimed damages.

- Evaluated plaintiffs' claim of lost success fees, lost closing fees, and underpayment of value relating to defendant's acquisition of an oncology laboratory and the alleged failure to consummate additional acquisitions. Analysis demonstrated plaintiffs' projections regarding the profitability of the proposed acquisitions were not reasonable given the historical financial performance of the targets. Also demonstrated plaintiffs were not underpaid for the assets of the acquired laboratory since no investor or buyer was willing to provide funds to plaintiffs pre-acquisition and since plaintiffs in their valuation approach inappropriately assigned all post-acquisition synergies and gains to the plaintiffs.

- Evaluated plaintiff's damage claim arising from an alleged misappropriated opportunity to develop a computer superstore franchise in Mexico based on the equivalent U. S. concept. Demonstrated plaintiffs overstated per store revenue, understated store-level costs, and used inappropriate financial and strategic assumptions regarding the number of stores opened, the amount of capital required, outside investor contribution, equity shares, and strategic acquisitions. Plaintiffs also conducted a valuation based on companies bearing little or no resemblance to a computer superstore.

- Evaluated plaintiff's claim of damages in a breach of contract matter in the magazine publishing and distribution industry. Plaintiff claimed defendants breached a distribution agreement by suspending distribution pending the resolution of a trademark infringement dispute. Plaintiff abandoned the magazine, claiming lost profits and the estimated lost value of the magazine had it been sold after its fourth year of publication. Analysis demonstrated plaintiff's expert overstated subscription-based revenues, distorted the cost/revenue structure that would have existed for the magazine, and overstated the likelihood of success by ignoring the failure of similar genre magazines.

- Evaluated class action damages relating to the production and sale of allegedly defective water heaters over a ten-year period. Issues included allegedly high failure rates, replacement costs, and property damage. Evaluated plaintiffs' use of the Weibull distribution function to predict failure and survivor rates. Settlement payments to mass retailers were used as an offset to damages.

- Evaluated plaintiff's claimed damages against a major telecommunications company for allegedly failing to perform under a Joint Marketing Agreement relating to an online internet-based commercial oil field equipment locator system. Analyses included assessing alternative internet sites that would have provided competition, demonstrating that plaintiff failed to properly mitigate damages, and that plaintiff's business forecasts were overly optimistic.

- Evaluated the damages sustained by the public safety division of an information technology services firm due to the early termination a ten-year services agreement to provide enhanced 9-1-1 services to a governmental agency. One-time up-front implementation costs in setting up the 9-1-1 system and ongoing operational costs were compiled in constructing a cost reimbursement damage claim. Also evaluated the reasonableness of an early termination charge schedule designed to represent the one-time buyout total if the governmental entity opted to terminate the contract before the ten-year term expired.

- Provided consulting services rebutting attempts to exclude another expert's damages analysis in a major "overcharges" case in the food industry. The opposing experts were attempting to use the "Daubert" and "duPont/Robinson" factors to exclude the original expert's analysis.

- Evaluated plaintiff's claimed damages in a breach of contract matter involving the marketing of an extremely low frequency (ELF) electro-magnetic radiation protection system (RPS) for video display terminals. At issue was the likely market penetration rate of a new RPS add-on device given declining monitor prices and improved radiation standards for monitors. Testified at a Daubert hearing with respect to the unreliability of plaintiff's financial expert's calculations.

- Evaluated the claimed damages of a Savings and Loan institution purchased as part of the "Southwest Plan" whose capital forbearance ratios were disallowed after the passage of FIRREA. Analyzed was the language of the forbearance contract with respect to minimum capital ratios, the length of the capital forbearance period, and the alleged undamaged performance of the Savings and Loan over the contract period.

- Evaluated the damage claim of a bank arising from an allegedly defective conversion of the bank's data processing system. Areas investigated included the softening macroeconomic environment surrounding the bank during the relevant time period, the changing financial services market, internal bank ratios, and technical flaws contained in plaintiff's damage calculations.

- Estimated lost sales and lost royalty payments to a "thick" potato chip producer due to a breach of contract. Involved was the construction of a damage model, analyses of the market for potato chips and per capita potato chip consumption, and projecting the rate of introduction of a new potato chip into regional markets.

- Calculated damages and provided other economic analyses in a "lack of best efforts" breach of contract case in the carbonated soft drink industry. At issue was the impact on sales due to the "lack of best efforts" vs. the impact on sales from contemporaneous new entrants into the market.

- Calculated damages in a breach of contract matter involving an association of neuphrologists and a management company operating 12 kidney dialysis clinics. Areas of investigation included the "profitability available for distribution" from the clinics, the projected rate of growth in patients, the rate of introduction of new clinics, and the costs associated with running the clinics. A damage model was developed which projected the profits that would have been distributed to the management company over the life of the contract in the absence of the breach.

- Participated in the development of a damage model relating to lost licensing fees and royalties from a breach of contract case involving an international marketing arrangement in the carbonated soft drink industry. At issue was the level of sales that could be expected from the introduction of a new carbonated soft drink into various foreign markets.

- Evaluated claimed damages against a hospital for allegedly breaching a contract allowing hyperbaric oxygen services on hospital premises. Investigations included assessing the local market for hyperbaric services, evaluating plaintiff's business growth potential given the physical space constraints at the hospital, and demonstrating plaintiff had fully mitigated claimed future damages through the establishment of an alter ego firm at a nearby local hospital.

- Evaluated a damage claim made by a multi-brand automobile paint distributor alleging wrongful termination of the distribution agreement with respect to one particular brand. At issue was the projected sales of the distributor in the absence of the termination, the incremental cost of additional sales, and the mitigation of alleged damages by the acquisition of an additional paint line.

- Evaluated a breach of contract damage claim in the insurance industry arising from the alleged violation of a non-compete clause in an employment contract. Issues investigated included loss ratios and customer retention rates for firms in the insurance industry, and the application of these ratios to the impacted customer base.

- Evaluated damages in numerous other breach of contract matters involving gunite swimming pools, anesthesiology services, discount tire distributors, and mortgage lending.

## Lender Liability Cases

- Evaluated plaintiff's allegations that it was capital constrained and consequently economically damaged as a result of its loans being placed into the special assets department of its lender. Analyzed the plaintiff's unused cash, credit, and other available funds. Also analyzed plaintiff's successful access to the capital markets, acquisition spending, R & D spending, sales performance, and profitability relative to peer companies.

- Analyzed plaintiffs' damage claim in a lender liability suit relating to defendant's alleged failure to fund certain residential housing development and construction loans. Evaluated plaintiffs' changing five-year business plan projections, including revenue growth, geographic expansion, market share, salesmen coverage, cost structure, and profitability assumptions. Also evaluated plaintiffs' strategy for "exiting" the business and the alleged value of their ownership at that time.

- Evaluated damages in a lender liability case involving the bankruptcy of a gear manufacturing company. The bankruptcy was allegedly due to the failure of a bank to fully fund a previously committed loan. Investigations included researching alternative market-related reasons for the decline in the gear manufacturer's business as well as evidence of internal mismanagement on the part of the company's owners.

- Evaluated damages, causation issues, and liability issues in various lender liability cases involving the calling in of loans, the failure to fund previously committed loans, the failure to release collateral, and the misappropriation of loan payments. Cases involved firms in the wire and cable, drywall/construction, PVC piping, and auto dealership industries.

## Entertainment-Related Engagements

- Estimated the diminished box office revenues suffered by a theatrical release due to the breach of a quick service restaurant promotional tie-in arrangement with a major pizza chain. Developed a database of recently released films and related film characteristics such as genre, rating, critics review, box office revenues, media spending, production budget, season of release, and talent. A regression model was then developed to quantify the relationship between media spending and box office revenue. An industry review of quick service restaurant promotional tie-in arrangements was also conducted.

- Estimated damages arising from a breach of contract claim between an electronic retailer and a local television station. At issue was the lost profits to the electronic retailer when the local television station discontinued broadcasting the electronic retailer's programming.

- Analyzed the market and evaluated damages on behalf of a television station denied access to a cable system. At issue was whether the cable operator was attempting to monopolize the market for local television advertising. Analysis included an estimation of the advertising revenues that would have been received by the local television station had it been allocated a channel on the cable system.

- Performed event studies and calculated damages in securities litigations filed against major entertainment firms. In one case, analyzed the economy-wide, industry-specific, and company-specific factors explaining the firm's stock price movements since its initial public offering. In a second case, determined the "takeover" premium actually paid compared to what the "takeover" premium would have been absent news leaks concerning a possible takeover.

- Estimated damages arising from a breach of contract claim between a video-cassette manufacture/distributor and a theatrical motion picture producer/distributor. At issue was whether the motion picture distributor manipulated the theatrical release of certain titles distorting the films the video-cassette producer could distribute under the terms of the agreement.

- Participated in the development and subsequent analysis of a database of television programs. Also analyzed network versus studio profitability in this major entertainment industry case.

- Evaluated and critiqued a damage claim for lost licensing fees stemming from a dispute an individual had with a network over the idea for a television show.

- Analyzed the license fees received by studios from networks for half-hour film series, half-hour tape series, hour series, and movies of the week. Also analyzed the direct costs of producing each of these types of shows.

## Tax-Related Engagements

- Participated in an analysis of the impact on tax revenues to the State of Texas from a change in tax laws relating to pension fund managers. Helped demonstrate that changing the apportionment rule from "location in which the investment services were performed" to "residence of the investment beneficiaries" would not result in a negative fiscal impact.

- Served as consulting partner on an engagement estimating qualifying research and expenditure costs in response to certain expenses disallowed by the IRS. Analysis included developing a methodology to estimate qualifying hours and qualifying costs for groupings of employees with missing data.

- Analyzed whether the salaries paid to the owners/managers of a heavy and highway construction company were reasonable in a matter before the IRS. Areas investigated included the cyclical nature of the construction industry, the resulting cyclical nature of compensation paid to construction industry executives, and the 50th and 75th percentile salaries paid to various types of executives in the construction industry.

- Investigated the impact of a computer programming error within a bank which inadvertently allowed ERISA funds to be used in overnight repurchase agreements. The magnitude of the funds involved was estimated, as well as the resulting IRS penalties.

- Participated in an analysis of the tax benefit versus detriment to a plaintiff as a result of ownership in certain partnership interests over the 1982-1998 time period. Also involved was an analysis of cumulative suspended tax losses, partnership income available for distribution, and changing tax rates over time.

- Quantified the net out-of-pocket cash position of investors who purchased limited partnership interests in nine real estate partnerships in an alleged non-disclosure matter. Also quantified the impact caused by changes in the Federal income tax laws. Supporting analyses included comparing the actual and projected performance of the partnerships taking into account restructurings, refinancings, and dissolutions.

**Personal Injury and Wrongful Death Cases**

- Assessed damages and lost earnings in various personal injury cases involving movie production workers, management consultants, financial consultants, nurses, medical doctors, chiropractors, secretaries, truck drivers, airline stewardesses, mechanics, engineers, maintenance personnel, carpenters, masonry workers, crane operators, machine operators, actresses, military aircraft production workers, tankermen, teachers, film editors, portfolio managers, hair stylists, automobile assemblers, landscape architects, sole proprietors, and real estate agents (among others). In each case, issues investigated included an assessment of the projected undamaged income, damaged income, expected work life of the individual, and appropriate discount rate to use. Assistance to the attorney included the preparation of deposition questions, economic analyses, and a critique of the opposing economist's damage model.

- Developed numerous damage models in wrongful death cases. Issues investigated included the projection of lost earnings, the projected personal consumption expenditures of the decedent, and projected lost pension benefits. Professions of the decedents included various types of entrepreneurs (e.g., boat store owners, etc.), white-collar workers (e.g. attorneys, architects, etc.), and blue-collar workers (e.g., demolition contractors, grocery store clerks, etc.). Ages of the decedents ranged from adults to teenagers to children.

**Wrongful Termination Cases**

- Evaluated plaintiff's claims of economic harm in a wrongful termination / negligent misrepresentation matter. Plaintiff claimed that pre-termination certain representations by the company dissuaded him from resigning and selling his stock holdings, thereby causing economic harm from the subsequent decline in the company's stock price. Analysis included quantifying the salary, bonuses, pension benefits, and severance pay the plaintiff received the additional time spent with the company as compared to the stock price declines that formed the basis of plaintiff's damages claim.

- Evaluated plaintiff's loss of earnings claim in an alleged wrongful termination matter in the long distance telecommunications industry. Plaintiff was an independent representative with a "downline" working for a company using a multilevel marketing sales approach. Analyzed the plaintiff's historical earnings, business expenses, and the earnings of plaintiff's peers to evaluate plaintiff's net earnings in the absence of the alleged wrongful termination.

- Evaluated plaintiff's damage claim in a wrongful termination matter involving an insurance broker/branch manager. Evaluated plaintiff's alleged damage period, earnings in the absence of the termination, fringe benefits, business expenses, and offsetting earnings. The sales patterns of the relevant insurance products at the state and national level were incorporated into the analysis. Also analyzed trends within the company with respect to branch manager positions.

- Evaluated plaintiff's claim of lost earnings arising from his departure as a senior sales representative for a major steel manufacturing company as a result of alleged sexual harassment by co-workers. Analysis included evaluating alleged lost earnings, lost non-salary benefits, and the length of the damage period given the plaintiff's occupation and the state of the local labor market.

- Evaluated the damages suffered by the manager of an over-the-counter trading department in an alleged wrongful termination action. Since the compensation of the manager was based on the profitability of the department, one issue investigated was the reason for the decline in the post-termination performance of the department.

- Assessed damages and lost earnings in other wrongful termination cases involving internal medicine specialists, neurosurgeons, anesthesiologists, entertainment company executives, brokers/traders, secretaries, accountants, attorneys, quality assurance managers, company presidents, real estate brokers, property managers, insurance brokers/managers, and military aircraft production workers. Areas investigated include many of the same items as described in personal injury cases.

**Other Economic Engagements**

- Conducted an economic analysis of historical and projected lost revenues due to SEC-related independence constraints for an information technology consulting entity. The analysis demonstrated that SEC rules requiring SEC registrants to disclose the amount of non-audit fees paid to its auditor, as well as constraints on the consulting entity's ability to perform outsourcing or managed application services for audit clients significantly impacted business growth relative to the market and its closest competitors. The analysis also demonstrated that certain revenue projections assuming independence relief were appropriate in light of market conditions and the independence constraints.

- Conducted an economic cost/benefit analysis of the SEC's proposed rule changes relating to non-audit services performed by auditing firms for audit clients. Analyses demonstrated that public accounting firms have an incentive to protect their brand name capital and that purchasers of non-audit services have an incentive to maintain investor confidence in the reliability of the audited financial statements.

- Provided economic analysis relating to claims of unfair competition and misleading advertising in the pizza industry. Using economic indicia such as dollar sales revenue, trends in market share, growth in number of stores opened, same-store sales data, and store closure rates, evaluated whether the commercial success of a particular pizza company was due to customer acceptance of its pizza product or allegedly deceptive advertising. Also investigated the buying patterns of pizza consumers with respect to cross-chain patronage.

- Performed an economic impact analysis on behalf of a major pipeline corporation seeking to gain regulatory approval for the construction of an oil pipeline in the Pacific Northwest. Evaluated the net economic impact of the project on employment, income, and consumer expenditures in the region. New employment opportunities resulting from construction and maintenance of the pipeline were compared to the potential lost jobs associated with the alternative means of transporting the petroleum.

- Participated in a major antitrust risk assessment exercise for a large industrial corporation. Work performed included evaluating the major litigation risks in the areas of monopolization, price discrimination, price fixing, illegal tying, and exclusive dealing. A detailed questionnaire designed to collect relevant economic data and identify potential risks was constructed and sent to the corporation's division managers.

- Evaluated revenue projections relating to an electronic toll collection system. The system was designed to recover lost toll revenue and other administrative fees from toll violators traveling along a consortium of tollways in New York, New Jersey, and Delaware. Analyzed four critical revenue drivers in the projections (number of transactions, violation rates, citation rates, and collections rates) and the potential variability of certain components of the projections by compiling comparative data through interviews with industry participants. Analysis was used in assisting lenders evaluating the economic viability of the project.

- In a bankruptcy matter, analyzed the expected rate of return that could be earned on a portfolio of assets. Included in the analysis was determining the investment portfolio of a prudent pension fund manager and the historical risk premiums earned on each category of assets in the portfolio. The assets were being held to meet future pension plan liabilities.

- Conducted an analysis of low-cost housing in Los Angeles County (CA) to determine whether sufficient housing was available to house the County's general relief recipient population. In separate engagements, conducted similar studies for San Bernardino County (CA) and Alameda County (CA). The Alameda County study also analyzed earned income incentives and food stamp allotments as a source of income in addition to the County's monthly general relief assistance. An affordable housing analysis was also conducted for the State of New Jersey's Department of Health relating to the state's child exclusion policy and AFDC recipients.

- Analyzed housing prices in Los Angeles and Orange Counties (CA) as part of an evaluation of a damage claim asserting lost future equity opportunities due to the actions of a "watchdog" agency, and the subsequent removal of a boarding home's clients and license.

- Conducted a confidential survey of the Big Seven Japanese Automobile Manufacturers (i.e., Toyota, Honda, Nissan, Mazda, Mitsubishi, Isuzu, and Subaru) to determine the magnitude of their contribution to the United States economy.

- Evaluated the economic impact of a professional sport team on a major metropolitan area.  Also participated in an analysis of the determinants of season attendance.

- Participated in an analysis of the economic benefits to a major Southwestern city from a corporation relocating its headquarters to that city.  Analysis included likely economic multiplier effects.

- Conducted an economic analysis on behalf of the California Public Utilities Commission.  Tasks included incorporating elasticities into alternative rate design and pricing models, analyzing subsidies accruing to various residential consumer groups under alternative rate designs, and estimating the relative welfare loss associated with each alternative rate design.

- Calculated the cost of raising a third child in a wrongful birth case stemming from an unsuccessful vasectomy.

- Conducted an analysis of employee retirement account data in an ESOP class action suit.  Tasks included a projection of new hires and terminations for a particular firm and dividing the class action suit members into various subclasses.

### Fraud/Criminal-Related Engagements

- Evaluated plaintiff's claim of damages stemming from the alleged embezzlement of funds and falsification of income statements by a bank official relating to a mortgage lending division of a bank.  Analysis identified errors made by the bank in specifying the length of the damage period and not properly accounting for accounts receivable collections made post-discovery of the alleged illegal acts.

- Analyzed skilled nursing facility nursing ratios in a criminal health care fraud matter relating to Medicare reimbursements.  At issue was defendant's ratio of skilled nursing costs to unskilled nursing costs alleged to be outside of governmental guidelines.  Analyzed facility-level ratios by establishing peer groups of facilities based upon size of facility, number of participating beds, skilled utilization percentage, state location, average length of stay, and facilities with similar levels of acuteness.

- Estimated freight overcharge damages on behalf of a major multinational information technology services firm.  Analysis required the utilization of a database of all freight shipments made over a five-year period, including incorporating subsequent credit memos, discounts, and dimensional weight charges.  Analysis compared actual freight charges to rates charged by alternative carriers for shipments of identical ship method (e.g., ground, next day, two day), weight, and destination.

- Performed economic analysis relating to a health care criminal matter in which a group of doctors and a hospital were alleged to have conspired to receive remuneration in return for the referral of Medicare-eligible patients.  Analyze included evaluating the savings from reduced admissions rates and from reduced average length of stays.  Also analyzed the profitability of certain laboratory-related work.

### Marital Dissolution Cases

- Calculated "professional goodwill" and a partner's share of accounts receivable and work-in-process in a marital dissolution litigation involving an attorney.

- Conducted an analysis of the division of community property in a litigation following a marital dissolution where the marital settlement agreement had seven subsequent amendments.  Also involved was the tracing of funds from the sale of a real estate investment where a substantial portion of the total price changed hands outside of escrow.

- Evaluated the stock price performance of a major distiller over a forty-year period. At issue was whether a portion of the increase in the stock price could be attributed to the efforts of one senior official in the corporation. Company-specific, industry-specific, and economy-wide factors were investigated to determine the reasons for the stock price performance of the distilling company.

## TEACHING EXPERIENCE

### Macroeconomic Principles and Intermediate Macroeconomics

Topics covered included unemployment/full employment, inflation/price stability, economic growth/gross domestic product, determination of national income, and monetary and fiscal policies.

### Microeconomic Principles and Intermediate Price Theory

Topics covered included functioning of markets (demand and supply analysis), elasticities, theory of the firm (profit maximization), industry performance, allocation of resources, and government regulation.

## PUBLICATIONS

"Lost Earnings of Persons" (with Randi L. Firus), Litigation Services Handbook, Fourth Edition, edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, 14.1 – 14.17, New Jersey: John Wiley & Sons, Inc., 2007. (Earlier versions of this chapter were contained in prior editions.)

"Financial Expert Witness Challenges and Exclusions: Results and Trends in Federal and State Cases Since Kumho Tire" (with Lawrence F. Ranallo), Accountants' Handbook, 11th Edition, edited by D.R. Carmichael, O.Ray Whittington, and Lynford Graham, New York: John Wiley & Jones, Inc., 2007.

"Accounting for Damages in Intellectual Property Litigation" (with Tony Samuel and John Davis), Building and Enforcing Intellectual Property Value – an International Guide for the Boardroom 2003.

"Challenges to the Admissibility of Financial Expert Witness Testimony" (with Lawrence F. Ranallo), Litigation Services Handbook, 2002 Supplement, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 2A.1 – 2A.17, New York: John Wiley & Sons, Inc., 2001.

"Preparing the Financial Expert or Economist" (with George G. Strong, Jr.), Witness Preparation, V. Hale Starr, 13.4 – 13.4.1, New York: Aspen Law & Business, A Division of Aspen Publishers, Inc., 1998.

"The Effect of Institutional Setting on Behavior in Public Enterprises: Irrigation Districts in the Western States" (with John M. McDowell), Arizona State Law Journal, Vol. 1982, No. 2, 453 – 496.

**Exhibit 2**

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

## KEITH R. UGONE, PH.D.
## TRIAL, HEARING, AND ARBITRATION TESTIMONY[1]

Bueno Conato, LLC vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

Akamai Technologies, Inc. and Massachusetts Institute of Technology vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2008)

Blackboard Inc. vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008 – trial and injunction hearing)

Applied Medical Resources Corp. vs. United States Surgical Corporation (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2008)

Electronic Data Systems Corporation vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. Microsoft Corporation (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:06-CV-140-RHC) (2007)

YC Partners, LTD. d/b/a Yantis Company vs. Zach Hall; Rodman Excavation, Inc. d/b/a Rodman Companies, San Antonio Division; Rodman Utilities, L.P.; Rodman Power & Communications, LLC; Rodman Natural Resources, Inc.; Rodman Paving, Inc. (In The District Court, Bexar County, Texas, 285th Judicial District, No. 2007-CI-03027). (2007) (Hearing regarding Motion to Compel Plaintiff's Documents)

QPSX Developments 5 Pty Ltd vs. Nortel Networks Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:05CV-268) (2007)

AVID Identification Systems, Inc. vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

TiVo Inc. vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2006)

---

[1] Trial, hearing, and arbitration testimony over the 1990-2008 time period. Case citations and dates subject to verification. Deposition testimony begins on page 6.

1

**Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.**

William Ziegler and DenLou, Inc. vs. Synergistic International, LLC (American Arbitration Association, Dallas, Case No.: 71 114 E 00733 04) (2005)

Dr. Phillips, Inc. vs. Control Laser Corporation and Excel Technology, Inc. (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

William A. Wise vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

Aviall Services, Inc. vs. Honeywell International, Inc. and Kelly Aerospace, Inc. (American Arbitration Association, Los Angeles, Arbitration No. 71 Y 181 00717 03) (2005)

MCI Worldcom Network Services, Inc. vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2005)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. Baker Botts, L.L.P., Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2005)

Brooktrout, Inc. vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Colgate-Palmolive Company vs. The Procter & Gamble Company (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

Electronic Data Systems Corp. vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2004)

PK Ventures, Inc. and Subsidiaries, PK Ventures Limited Partnership, and Robert M. Rose and Alice N. Rose vs. Commissioner of Internal Revenue (United States Tax Court, Jacksonville, Florida, Docket Nos. 005836-99, 006395-99, and 10154-99) (2004)

Brine, Inc. and Sports Licensing, Inc. vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2003)

Teleplus, Inc., vs. Avantel, S.A. (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. Sunstar Acceptance Corporation and NationsCredit Commercial Corporation (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2003)

**Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.**

Steven R. Keene d/b/a Pagers Plus vs. AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services (Judicial Arbitration and Administration Services, Inc.) (2003)

Poly-America, Inc. vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Morgan Howard, L.L.C. vs. Immedient, Inc. (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

Andrew Cumming vs. J. C. Penney Company, Inc. (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. Bank of America, Arizona (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

COC Services, Ltd. vs. CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V., TPC Acquisition Corp., Carlos Slim Helu and James Halpin (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2001)

United States of America vs. Dan Anderson (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (2000)

Scott K. Ginsburg vs. Goldman, Sachs & Co. (Before the National Association of Securities Dealers, Inc., Dallas) (2000)

TCP Holdings, LLC, Robert Neely, and David Thomas vs. Tim Kirk (Before the American Arbitration Association, Dallas, Case No. 71 18000564 98) (2000)

United States of America vs. Dan Anderson and Baptist Medical Center (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (1999; Sentencing Hearing)

In the Matter of Application No. 96-1, Olympic Pipe Line Company: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Magnetic Technologies, S.P.R.L. vs. Connectware, Inc. (In the District Court Dallas County, Texas, 68th Judicial District) (1998; Daubert/Robinson Hearing Testimony and Trial Testimony)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by Conseco, Inc., A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1998)

3

**Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.**

Sledge W. Killion vs. Metropolitan Life Insurance Company, et al. (Before the National Association of Securities Dealers, Inc., Dallas, NASD Arbitration No. 95-05997) (1997)

Reedrill Corporation vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1997)

Robert Tuck vs. Westec Security, Inc. (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Exar Corporation vs. SGS-Thomson Microelectronics Srl (Court of International Arbitration of the International Chamber of Commerce, New York) (1996)

Nationwide Business Telephones and Team Centrex vs. Introlink Communications System, Inc. and Pacific Bell, Inc. (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. Electronic Data Systems Corporation (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

Rauscher, Pierce, Refsnes, Inc. vs. Alfred W. Anderson, Jr. (Before the National Association of Securities Dealers, Inc., Dallas) (1995)

Ivy Goth vs. City of Los Angeles and Department of Water and Power (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1995)

Bio-Medical Applications Management Company, Inc. vs. Dallas Nephrology Associates (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:94CV37) (1995)

Cybor Corporation vs. FAS Technologies, Inc. (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1995)

Phillips Petroleum Company vs. Rexene Corporation (U.S. District Court for the District of Delaware, Civil Action No. 1:90CV208) (1994)

Donald J. Dougher, et al. vs. Gerard J. Dougher, Sr., et al. (Superior Court of the State of California for the County of Orange, Case No. 677451) (1994)

Texas State Bank, et al. vs. Electronic Data Systems Corporation (206th District Court of Hidalgo County, Texas) (1994)

Union Oil Company of California vs. International Insurance Company, et al. (Superior Court of the State of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. GTE Products Corporation and Sylvania Lighting Services Corporation (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993)

**Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.**

Arley Del Gado vs. County of Los Angeles (Superior Court of the State of California for the County of Los Angeles) (1993)

Villarreal vs. East Union High School District (Superior Court of the State of California) (1993)

Sunbelt Television, Inc. vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

Clayton Jacobson vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc. vs. Premier Ventures, Inc., dba Premier Building Maintenance (Superior Court of the State of California for the County of Los Angeles) (1990)

Southwest Tank Liners vs. Joor Manufacturing, Inc. (U.S. District Court for the Central District of California) (1990)

Deposition Testimony of Keith R. Ugone, Ph.D.

## KEITH R. UGONE, PH.D.
## DEPOSITION TESTIMONY[2]

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008)

Bueno Conato, LLC vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

O₂Micro International Limited vs. Rohm Co. Ltd., Sony Corporation, Sony EMCS Corporation, Sony Corporation of America, and Sony Electronics Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2-05-CV-00211-TJW) (2008)

Blackboard Inc. vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008)

Abbott Laboratories and Abbott Diabetes Care Inc. vs. Roche Diagnostics Corporation, Roche Diagnostics Operations, Inc., and Bayer Healthcare LLC; Abbott Laboratories and TheraSense, Inc. vs. Beckton, Dickinson and Co. and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 MJJ, Civil Action No. C04-3327 MJJ, Civil Action No. C04-3732 MJJ, and Civil Action No. C05-3117 MJJ) (2008, two depositions)

United States of America, ex rel Toni R. Barron and Vicky J. Scheel vs. Deloitte & Touche, LLP, Deloitte Touche Consulting Group, LLC, Deloitte & Touche Consulting Group Holding, LLC, Medicaid Solutions of Texas, and National Heritage Insurance Company (In The United States District Court, Western District of Texas, Civil Action No. SA-99-CV-1093FB) (2007)

Akamai Technologies, Inc. and Massachusetts Institute of Technology vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2007)

Electronic Data Systems Corporation vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. Microsoft Corporation (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:06CV140-RHC) (2007)

---

[2] Deposition testimony over the 1990-2008 time period.  Case citations and dates are subject to verification.

Deposition Testimony of Keith R. Ugone, Ph.D.

Tinkers & Chance vs. LeapFrog Enterprises, Inc. (In The United States District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-349-TJW) (2007)

DEJ Productions, Inc., Blockbuster Inc., and First Look Studios, Inc. vs. Media 8 Entertainment and MDP Distribution, Inc. (In The District Court of Dallas County, Texas, M-298th Judicial District, Cause No. 06-01887) (2007)

Art International Forwarding, Inc. vs. The Pasha Group and Gosselin Worldwide Moving, N.V. (In The United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:05-CV-01410-RWS) (2007)

Applied Medical Resources Corp. vs. United States Surgical Corporation (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2007)

Nike, Inc. vs. adidas Salomon North America, Inc., adidas America Inc. d/b/a adidas International, and adidas Promotional Retail Operations Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-43-RHC) (2007)

BIAX Corporation vs. Intel Corporation and Analog Devices, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-184-TJW) (2007)

Two-Way Media, LLC vs. America Online, Inc. (In The United States District Court For The Southern District of Texas, Corpus Christi Division, Civil Action No. C-04-089) (2007)

In re Enron Corporation Securities Litigation; Kevin Lamkin, Janice Schuette, Robert Ferrell and Stephen Miller vs. UBS Financial Services, Inc. and UBS Securities LLC (Civil Action No. H:02-CV-0851; Consolidated MDL) and Samuel Giancarlo vs. UBS Financial Services, Inc., UBS Securities LLC., and UBS AG (Civil Action No. H-03-4359; Consolidated MDL) (In The United States District Court For The Southern District of Texas, Houston Division) (2007)

O₂Micro International Limited vs. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-323 (Ward)) (2007)

CNX Gas Corporation and CNX Gas Company LLC vs. CDX Gas Company LLC vs. CONSOL Energy, Inc. (In The United States District Court For The Western District of Pennsylvania, Civil Action No. 05-CV-1574) (2007)

Parkade Center, Inc. vs. Simon Property Group (Texas), L.P. and Simon Property Group (Delaware), Inc. (In The District Court 398th Judicial District of Hildalgo County, Texas, Cause No. C-2584-06-1) (2007)

The Post Confirmation Trust (The Fleming Companies) vs. Digital Exchange Systems, Inc. (In The United States District Court for the Eastern District of Texas, Texarkana Division, No. 5:05-CV-165(TJW)) (2007)

7

Deposition Testimony of Keith R. Ugone, Ph.D.

Golden Bridge Technology, Inc. vs. Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., Qualcomm Incorporated, and Lucent Technologies, Inc. (In The United States District Court for the Eastern District of Texas, Tyler Division, Civil Action No: 6:06-cv-00163-LED) (2006)

John P. Rochon, Nick G. Bouras, Nu-Kote International, Inc., J.R. Investment Corporation, Richmont Corporation and Nu-Kote Acquisition Corporation vs. Akin Gump Strauss Hauer & Feld, LLP and Alan Feld (In The District Court of Dallas County, Texas, 192nd Judicial District, Cause No. 04-03311-K) (2006)

Autobytel Inc. vs. Dealix Corporation (United States District Court Eastern District of Texas, Marshall Division, Case No. 2:04-cv-338-LED) (2006)

Electronic Data Systems Corporation and EDS Information Systems, L.L.C. vs. MCI Communications Services, Inc. (Before the American Arbitration Association, Arbitration No. 13 181 00976 06) (2006)

Jeffrey A. Kozak vs. Medtronic Sofamor Danek (In The United States District Court for the Southern District of Texas, Houston Division, Civil Action Number H-03-4400) (2006)

Alcon Manufacturing, Ltd. and Alcon Laboratories, Inc. v. Advanced Medical Optics, Inc. (In The United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4-05CV-496-A) (2006)

Eckhard U. Alt, MD vs. Medtronic, Inc. (In The United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:04CV370) (2006)

AVID Identification Systems, Inc. vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

In re: Williams Securities Litigation (WCG Subclass) (In The United States District Court for the Northern District of Oklahoma, Case No. 02-CV-72H(M)) (2006)

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson vs. Fulbright & Jaworski, LLP (United States District Court Western District of Texas, Austin Division, Cause No. A 05 CA 334 SS) (2006)

Children's Medical Center of Dallas vs. Columbia Hospital at Medical Center Dallas Subsidiary L.P. (In The United States District Court Northern District Of Texas, Dallas Division, Civil Action No. 3:04-CV-2436-BD) (2006)

Vantage Controls, Inc. vs. Lutron Electronics Co., Inc. (In The United States District Court for the District of Utah, Central Division, Case No. 2:03-CV-00488TC) (2006)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

Blueberry Sales, L.P., f/k/a Blueberry Confections, Inc. vs. ED&F Man Sugar, Inc. (United States District Court for the Western District of Texas, El Paso Division, EP-04-CA0193) (2005)

Cummins-Allison Corp. vs. Glory LTD., Glory Shoji Co., LTD., and Glory (U.S.A.), Inc. (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2-03-CV-358 (TJW)) (2005)

Gilbert R. Sada and Victor L. Hernandez vs. Jack In The Box Inc. (United States District Court for the Western District of Texas, San Antonio Division. Civil Action No. SA04CA0541 (OG)) (2005)

Trinity Mother Frances Health System and Mother Frances Hospital vs. East Texas Medical Center Regional Healthcare System and East Texas Medical Center (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:03CV464) (2005)

TiVo Inc. vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2005; two depositions)

William Rutledge Scott, Individually and as Independent Executor of the Estate of Mozelle Rutledge Scott, Deceased vs. Hughes & Luce, L.L.P., Kathryn G. Henkel, and Laurel Stephenson (In the County Court of Tom Green County, Texas, Cause No. 02P211-L) (2005)

Junitha Bee, et al. vs. Kavilico Corporation, ITT Neodyne, Parker Hannifin, and the Boeing Company (Superior Court of the State of California, County of Los Angeles, Case No. C99-589C) (2005)

William A. Wise vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

Dr. Phillips, Inc. vs. Control Laser Corporation and Excel Technology, Inc. (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

MOSAID Technologies Incorporated vs. Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P. (In the United States District Court for the District of New Jersey, Civil Action No. 01-4340 (WJM)) (2004)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. Baker Botts, L.L.P., Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2004)

Brooktrout, Inc. vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Deposition Testimony of Keith R. Ugone, Ph.D.

MCI Worldcom Network Services, Inc. vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2004)

Colgate-Palmolive Company vs. The Procter & Gamble Company (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

Airbel Wireless, Inc. and JAVS Telecom, Inc. vs. AT&T Wireless Services, Inc. (American Arbitration Association, New York, Case No. 13 Y 199 00709 03) (2004)

Electronic Data Systems Corp. vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2003 and 2004; two depositions)

Anthony Stella and Mary S. Stella, Individually and on Behalf of all Persons Similarly Situated in the State of Texas vs. Grant Thorton, L.L.P. (In the District Court of Galveston County, 212th Judicial District) (2003)

Administaff, Inc. and Administaff of Texas, Inc. vs. Aetna Life Insurance Company (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:01CV3802) (2003)

GATT Trading, Inc. vs. Sears, Roebuck and Co. (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:01CV260) (2003)

IEX Corporation vs. Blue Pumpkin Software, Inc. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:01CV16) (2003 and 2005; two depositions)

Steven R. Keene d/b/a Pagers Plus vs. AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services (Judicial Arbitration and Administration Services, Inc.) (2003)

Teleplus, Inc., vs. MCI Telecommunications Corporation, MCI International Telecommunications Corporation, MCI International Inc., MCI Communications Corporation, MCI Worldcom, Inc., MCI Global Support Corporation, MCI Global Access Corporation, and Avantel, S.A. (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. Sunstar Acceptance Corporation and NationsCredit Commercial Corporation (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2002)

Customedia Technologies, LLC and William H. Lewis vs. Joby Hughes, Felsman, Bradley, Gunter & Dillon, Stephen Perkins, Sidley & Austin, Litigation Risk Management, Inc., and Granite Ventures, Inc. (In the District Court of Harris County, Texas, 125th Judicial District, Case No. 2000-26667) (2002 and 2003; two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

Edward Ahearn vs. Ernst & Young, L.L.P. (Before the American Arbitration Association, Case No. 13-107-00136-01) (2002)

John H. Houser and Frederick A. Raffa vs. Wachovia Corporation (In the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV1041-T-17MSS) (2002)

Brine, Inc. and Sports Licensing, Inc. vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2002 and 2003; two depositions)

Morgan Howard, L.L.C. vs. Immedient, Inc. (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

Poly-America, Inc. vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Andrew Cumming vs. J. C. Penney Company, Inc. (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. Bank of America, Arizona (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

Tyler Jet, L.L.C., TeamXtreme Racing, L.L.C., and Burl Outlaw vs. Lycos, Inc. (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:00CV-179) (2001)

EPI Environmental Products, Inc. vs. In-Line Plastics, L.C. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:98CV4209) (2001)

Health Laboratories of North America, Inc., et al. vs. Neodata Services, Inc. (In the Superior Court of the State of Arizona In and For the County of Maricopa, Civil Action No. CV1998-008143) (2001)

Acres Gaming Inc. vs. Mikohn Gaming Corporation and Casino Data Systems (In the United States District Court District of Nevada, Civil Action No. CV-S-01462-PMP (RJJ)) (2000)

COC Services, Ltd. vs. CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V., et. al. (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2000)

Healthtech Diagnostics, Corporation and Oncogenetics, Inc. vs. Impath, Inc. and Impath-HDC, Inc. (In the District Court of Dallas County, Texas, L-193rd Judicial District, Case No. 97-08552) (2000)

Pacific Southwest Bank and NAFCO Holding Company, LLC vs. Electronic Data Systems Corporation (In the District Court of Dallas County, Texas, 191st Judicial District, Cause No. 98-5954) (2000)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

Anthony D. Viazis, et. al. vs. American Association of Orthodontists, et. al. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:98-CV-245) (2000)

Kvaerner Oilfield Products, Inc. vs. Cooper Cameron Corp. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-98-3369) (2000)

J.V. Smith, et al. vs. Randyl Louis Harrell, Enterprise Products Company, et. al. (In the District Court of Liberty County, Texas, 75th Judicial District) (2000)

Norman Yourish, et. al. vs. California Amplifier, et. al. (Superior Court of the State of California for the County of Ventura, Civil Action No. CIV173569) (2000)

David Kimberly Hackett, individually and Samuel G. Swope, individually and as Assignees of Courtesy Auto Group, Inc. vs. Electronic Data Systems, Inc. (In the United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 98-1065-CIV-19-A) (2000)

County Council of Northampton County vs. SHL Systemhouse Corp. vs. Northampton County (In the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 98-CV-0088) (1999)

Natural Reserves Group, Inc. vs. Baker Hughes, Inc., et. al. (In the United States District Court for the Southern District of Texas, Harris County Division, Civil Action No. 96-31380) (1999)

BeautiControl, Inc. vs. Ryco Packaging Corp. vs. Arrowpak, Inc. and Custom Decorative Systems, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-98CV1775-H) (1999)

Peoples National Bank, Peoples National Mortgage Corp., and Texas Peoples National Bancshares, Inc. vs. Russell A. McClendon, St. Paul Mercury Insurance Company, Smith-Reagan Life and Health Insurance Agency, Inc. and Gary Robertson (In the District Court Lamar County, Texas, 62nd Judicial District) (1999)

In the Matter of Application No. 96-1, Olympic Pipe Line Company: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Petrofac, Inc. and Petrofac International, Ltd. vs. Howe-Baker Engineers, Inc. and Omar J. Ghalayini (In the County Court at Law; Smith County, Texas, Cause No. 39,839) (1998)

L & S Concrete Company, Inc., Gilliam Brothers, Inc., Webco, Inc., Charles T. Weaver, Gus Blass, III, Bob Townsell, Alex Lieblong, and Dr. Thomas Robinson vs. Trans World Airlines, Inc. (In the United States District Court for the Eastern District of Arkansas Western Division, Case No. Civ-97-378) (1998)

Magnetic Technologies, S.P.R.L. vs. Connectware, Inc. (In the District Court Dallas County, Texas, 68th Judicial District) (1998)

Deposition Testimony of Keith R. Ugone, Ph.D.

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by Conseco, Inc., A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1997)

Excel Telecommunications, Inc., Excel Communications, Inc., Steve Smith, and Kenny Troutt vs. Linden Wood, Brad Campbell, Candy Campbell, Jerry Szeszulski, and Team Excel of Independent Representatives (American Arbitration Association, Dallas, Texas Region) (1997)

Gourmet Award Foods vs. Continental Extrusion, Genpak Corporation, and Heartland Packaging Corporation (Judicial District Court of Dallas County, Texas, D-95[th] Judicial District) (1997)

L. Anne H. Frazier vs. Owsley Brown Frazier (Jefferson Family Court, Division Eight; Louisville, Kentucky, Case No. 94-FD-01957) (1997)

Dodee Frost Crockett vs. Randy Miller and Gina Kaiser (In the District Court of Dallas County, Texas; 192nd Judicial District) (1996)

Reedrill Corporation vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1996)

Robert Tuck vs. Westec Security, Inc. (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

James Hylsky and Terri Hylsky vs. Fruehauf Trailer Corporation, et. al. (In the Circuit Court Twentieth Judicial Circuit St. Clair County, Illinois) (1996)

In Re: CSC Industries, Inc. and In Re: Copperweld Steel Company (In the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, Civil Case No. 4:93bk41898) (1996)

Nationwide Business Telephones and Team Centrex vs. Introlink Communications System, Inc. and Pacific Bell, Inc. (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. Electronic Data Systems Corporation (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

Lacerta Enterprises, Inc. dba Frontline Systems, Inc. vs. Geac Computers, Inc. and Fasfax Corporation (U.S. District Court for the District of Arizona, Case No. CIV 95-0649 PHX (ROS)) (1995)

Bluebonnet Savings Bank, et. al. vs. Federal Deposit Insurance Corporation, et. al. (U.S. District Court for the Northern District of Texas, Dallas, Civil Action No. 3:91CV1066) (1995)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

Circo Craft Company, Inc. vs. AMP-AKZO Corporation, et. al. (Superior Court of the State of California for the County of San Diego, North County District) (1995)

BancTec USA, Inc. vs. Advanced Financial Solutions, et. al. (U.S. District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:93CV1277) (1994)

Ivy Goth vs. Datsun-Nissan Motor Company, Ltd., et. al. (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1994)

Cybor Corporation vs. FAS Technologies and FAStar Ltd. (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1994)

Texas State Bank, et. al. vs. Electronic Data Systems Corporation (206th District Court of Hidalgo County, Texas) (1994; two depositions)

Auto Color Specialists, Inc. and Polly Chen vs. BASF (Superior Court of the State of California for the County of Orange, Case No. 677861) (1994)

Tactical Edge, Inc. vs. Gall's, Inc. (District Court of the Fourth Judicial District of the State of Idaho in and for the County of Ada) (1994)

Arley Del Gado vs. County of Los Angeles (Superior Court of the State of California for the County of Los Angeles) (1993)

Dominquez vs. Holy Cross Hospital (Superior Court of the State of California for the County of Los Angeles) (1993)

Union Oil Company of California vs. International Insurance Company, et. al. (Superior Court of the State of California) (1993)

Maranatha Music! vs. Capital Cities, Inc./ABC, Inc., and Word, Inc. (U.S. District Court for the Western District of Texas, Waco Division) (1993)

Villarreal vs. East Side Union High School District (Superior Court of the State of California) (1993)

Official Committee of Creditors Holding Unsecured Claims on behalf of First Capital Holdings Corporation vs. Shearson Lehman Brothers Holdings Inc., et. al. (U.S. District Court for the Central District of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. GTE Products Corporation and Sylvania Lighting Services Corporation (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993; three depositions)

Sunbelt Television, Inc. vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

14

**Deposition Testimony of Keith R. Ugone, Ph.D.**

Holabird Sports Discounters vs. Tennis Tutor, Inc. (U.S. District Court for the District of Maryland, Civil Action No. 1:91CV2208) (1992)

Expo-Tech Electrical & Plumbing Services vs. Greyhound Exposition Services (1992)

De Laurentiis Entertainment Group, Inc. Securities Litigation; De Laurentiis Film Partners Securities Litigation (U.S. District Court for the Central District of California) (1991; two depositions)

James T. Ryan vs. Crowley Towing and Transportation and Shell Oil Company (Superior Court of the State of California for the County of Los Angeles) (1991)

Clayton Jacobson vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc., vs. Premier Ventures, Inc., dba Premier Building Maintenance (Superior Court of the State of California for the County of Los Angeles) (1990)

Frank V. and Gloria Lumbert vs. Robert C. Skinner and Lillian R. Skinner, et. al. (Superior Court of the State of California for the County of Los Angeles) (1990)

Plaintiff vs. Valley Hunt Club, Tournament of Roses, et. al. (Superior Court of the State of California) (1990)

Kippy Thomas vs. Mary Lendo and Circle K, (Superior Court of the State of California for the County of Riverside) (1990)

**Exhibit 3**

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
| --- | --- | --- | --- |

**Legal Documents**

Answer and Affirmative Defenses to the Second Amended Complaint

Declaration of Michael Reese in Support of Plaintiffs' Motion for Class Certification

Jernow And Lawrence v. Wendy's International, Plaintiff Leah McLawrence's Objections and Responses to Defendant's First Set of Interrogatories

Jernow And Lawrence v. Wendy's International, Plaintiff Leah McLawrence's Responses and Objections to Defendant's First Set of Requests for the Production Of Documents

Jernow And Lawrence v. Wendy's International, Second Amended Complaint for Deceptive Sales Practices; Breach of Implied in Fact Contract; Unjust Enrichment

Notice of Motion and Motion for Class Certification

Plaintiffs' Memorandum in Support of Motion for Class Certification

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| **Deposition Transcripts and Associated Exhibits** | | | |
| Company Store Price Points Following July 2006 Price Increase; Plaintiff Exhibit 17 (No Bates Number) | | | |
| Deposition Transcript of Adam Jernow, taken on May 7, 2008 | | | |
| Deposition Transcript of Casey Minton, taken on April 22, 2008 | | | |
| Deposition Transcript of Leah McLawrence, taken on May 8, 2008 | | | |
| Deposition Transcript of Lori Estrada, taken on May 6, 2008 | | | |
| Email Regarding Non-Hydrogenated Product; Plaintiff Exhibit 29 (No Bates Number) | | | |
| Leah McLawrence Facebook Page; Defendant Exhibit 20 | | | |
| OGI Management; Defendant Exhibit 2 | | | |
| Wendy's Corporate Website Pages; Plaintiff Exhibit 2 (No Bates Number) | | | |
| Wendy's Q1 2007 Earnings Call Transcript; Plaintiff Exhibit 4 (No Bates Number) | | | |
| Email Regarding New Par fry Oils, Jan. 26, 2007 | WEN | 038649 | 038649 |
| Wendy's: See What's New, Learn The Facts, Jun. 8, 2006 | WENDY'S TRANS-FAT | 0001 | 0003 |
| Wendy's U.S. Nutrition Information, 2006 | WENDY'S TRANS-FAT | 0004 | 0009 |
| Wendy's Article Confused About Nutrition? | WENDY'S TRANS-FAT | 0010 | 0011 |
| Wendy's Article Food Label: Assessing The Nutrition Facts | WENDY'S TRANS-FAT | 0012 | 0013 |
| Harvard School Of Public Health: New Food Labels List Trans Fats | WENDY'S TRANS-FAT | 0014 | 0018 |
| Consumer Reports Press Release That Tests Find Trans Fat In Wendy's Fries | WENDY'S TRANS-FAT | 0019 | 0019 |
| Wendy's Bag Label | WENDY'S TRANS-FAT | 0020 | 0021 |
| Bodycote FPL Inc. Test Results For Wendy's French Fries | WENDY'S TRANS-FAT | 0022 | 0022 |
| Wall Street Journal: Wendy's Fat Content Is Disputed By Tests | WENDY'S TRANS-FAT | 0023 | 0023 |
| CSPI Newsroom: Burger King And Wendy's Fries Flunk Trans Fat Test In New York City | WENDY'S TRANS-FAT | 0024 | 0025 |

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Are Fast-Food Fries Trans-Fat Free? | WENDY'S TRANS-FAT | 0026 | 0027 |
| Leah McLawrence Resume | WENDY'S TRANS-FAT | 0028 | 0028 |
| Jernow Resume And OGI Webpage | WENDY'S TRANS-FAT | 0029 | 0029 |

# Facts, Data, and Other Information Considered

## Documents Produced by Wendy's International, Inc.

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Near Memorandum, Jun. 24, 2006 | WEN | 002314 | 002315 |
| Spring 2006 Pricing Assessment Appendix; | WEN | 002326 | 002337 |
| Exhibits - Domestic - Standard - Fall 2006.xls Exhibit 1 – Hamburger prices; Exhibits - Domestic - Standard - Spring 2006.xls Exhibit 2 – Hamburger Combo; Competitive Hamburger Pricing – Spring 2006.xls; Exhibits - Domestic - Standard - Fall 2006.xls Exhibit 10 – French Fry prices | WEN | 002338 | 002351 |
| Price Trending Exhibits By Product, Competitor, Region And City | WEN | 002352 | 002369 |
| TFA Communications Plan May 2006 | WEN | 004138 | 004151 |
| Tier 1 Issues/Topics Trans Fatty Acids | WEN | 004153 | 004156 |
| Wendy's Issues Summit Preparation, Feb. 2006 | WEN | 004184 | 004188 |
| Executive Brief: Risk To Wendy's | WEN | 004210 | 004212 |
| Fry Portion Menu Council Update | WEN | 006264 | 006270 |
| Wendy's Trans Options E.G. Flavor Tradeoff, Fry Life Etc. Jan. 10, 2005 | WEN | 007041 | 007041 |
| Theoretical Cost Analysis 4-50 Lb. Fryers | WEN | 007613 | 007613 |
| Company Product Price Increase History 2000 – 2007 | WEN | 011893 | 011896 |
| Competitive and Franchise Pricing Survey Analysis | WEN | 011897 | 011935 |
| Consolidated Franchise Totals – Simple Average of DMA's | WEN | 022341 | 022341 |
| Total Franchise Only – Simple Average of Franchise-Only DMAs | WEN | 022368 | 022388 |
| Trans-Fatty Acid Renewal Market Test Summary, Jan. 13, 2006 | WEN | 022581 | 022610 |
| PowerPoint Slide Of Recommendations | WEN | 022647 | 022647 |
| Email Regarding Trans Fat Update, Jan, 24, 2006 | WEN | 022889 | 022889 |
| Email Regarding TFA Test Market Expansion, Jan. 27, 2006 | WEN | 02942 | 022943 |
| Email Regarding Trans Fat Descriptors, Feb. 7, 2006 | WEN | 023170 | 023170 |

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Email Regarding 2006 Weekly Sales/Trans/Check And 2006 Regional Sales Performance, Jul. 5, 2006 | WEN | 023539 | 023546 |
| Press Releases: Wendy' Sale Increase For First Time In Months; Wendy's Stock Up On Turnaround Plan Details; Could A Turning Point Be At Hand? | WEN | 023795 | 023797 |
| Email Regarding Nutrition Timeline, Jul. 10, 2006 | WEN | 024193 | 024193 |
| Email Regarding Wendy's Non-Hydrogenated Oil Cost Scenarios Jul. 10, 2006 | WEN | 024229 | 024231 |
| Email Regarding WNAP Business Review Aug. 7, 2006 | WEN | 025326 | 025336 |
| Press Release: Wendy's Is First Major Hamburger Chain Cooking With Oil That Zero Grams Of Trans Fat Per Serving, Aug. 23, 2006 | WEN | 025975 | 025975 |
| Average Price By SKU And City, Period 4, 2006 | WEN | 027610 | 027619 |
| Company Store Price Points Following July 2006 Price Increase By Item And City | WEN | 027620 | 027620 |
| Company Store Price Points Following July 2006 Price Increase By Item And City | WEN | 027622 | 027625 |
| Total Company Stores Pricing Impact Estimate Rolling 12 Months | WEN | 027626 | 027627 |
| Competitive and Franchise Pricing Survey Analysis: Spring 2006 Surveys | WEN | 027628 | 027700 |
| Competitive Key Franchise Pricing Survey – Spring 2006 Data Entry Guidelines | WEN | 027701 | 027702 |
| SE Franchise Pricing Data Spring 2006 | WEN | 027703 | 027713 |
| U.S. Franchise Pricing Data Spring 2006 | WEN | 027714 | 027719 |
| West Franchise Pricing Data Spring 2006 | WEN | 027720 | 027731 |
| Mw Franchise Pricing Data Spring 2006 | WEN | 027732 | 027738 |
| "New York (NY) DMA Franchise Pricing Data Spring 2006"; | WEN | 027739 | 027748 |
| Email Regarding Frozen Vs. Stacked Fries, Sept. 6, 2006; Plaintiff Exhibit 3 | WEN | 027873 | 027876 |
| Email Regarding BrandWeek, Wendy's Story, Sept. 25, 2006 | WEN | 029130 | 029132 |
| Big Dippers Portion And Recommended Pricing | WEN | 030159 | 030159 |
| Email Regarding Menu Price Recommendations, Nov. 20, 2006 | WEN | 033367 | 033368 |
| Email Regarding Oil Composition Nov. 22, 2006 | WEN | 034062 | 034062 |

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Email Regarding Production Oil For Wendy's | WEN | 034507 | 034507 |
| Email Regarding Production Oil For Wendy's | WEN | 034520 | 034520 |
| Wendy's Sensory Evaluation Report Nov. 29, 2006 | WEN | 034634 | 034364 |
| Email Regarding Wendy's Stock Price Decrease, Dec. 1, 2006 | WEN | 034712 | 034713 |
| Email Regarding Info From Wendy's | WEN | 034923 | 034923 |
| Email Regarding Pricing Approval And Next Steps, Dec. 6, 2006 | WEN | 035485 | 035485 |
| Email Regarding Trends In National Restaurant News, Dec. 15, 2006 | WEN | 036501 | 036502 |
| Wendy's Weekend Report, Dec. 18, 2006 | WEN | 036683 | 036684 |
| Top 25 Media Placements In 2006 | WEN | 038663 | 038714 |
| Email Regarding New Par Fry Oils, January 26, 2007 | WEN | 039009 | 039009 |
| Article USA Today, McDonald's Has Finally Found The Magic Formula To Wring The Artery-Clogging Trans Fat From Its Fries. 2007 | WEN | 039160 | 039160 |
| Email Regarding: USA Today, McDonald's Has Finally Found The Magic Formula To Wring The Artery-Clogging Trans Fat From Its Fries. 2007 | WEN | 039161 | 039162 |
| Email Regarding Media Inquiry, Feb. 6, 2007 | WEN | 040076 | 040077 |
| Email Regarding Mom-Rd Updates Through March, Feb. 12, 2007 | WEN | 042375 | 042381 |
| Dear Operator Letter regarding testing of par fry oil with supplier | WEN | 043737 | 043737 |
| Consumer Target; Brand Purpose; Unique Selling Proposition | WEN | 043943 | 043959 |
| Wendy's Ad | WEN | 044170 | 044170 |
| French Fry Label | WEN | 044172 | 044172 |
| Consolidated Franchise – Fall 2006.xls | WEN | 115301 | 115301 |
| Wendy's 2007 National Media Calendar 1.18.08 Rev23 – Final.ppt | WEN | 115302 | 115302 |

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| **Documents Independently Obtained** | | | |
| "Wendy's Fat Content is Disputed by Tests," Wall Street Journal Abstracts, Nov. 3, 2006. | | | |
| BrandWeek Publication Information; http://www.biotechmedia.com/y2004Brandweek.html | | | |
| Burger King Plans to Dump Trans Fats by 2008," Associated Press, Feb. 1, 2007 | | | |
| Commentary: Strategic Menu Pricing Boosts Profits; http://www.qsrweb.com/article.php?id=6062&prc =99&page=77 | | | |
| Consumer Report 'Fried' over Trans Fat at Wendy's; BrandWeek.com | | | |
| Cox News Service, General News Item, Jan. 7, 2007 | | | |
| Cox Newspapers Company Profile; http://www.coxnews.com/html/company.html | | | |
| Datamonitor, "Wendy's International Inc., Company Profile," Oct. 22, 2007. | | | |
| Dave Carpenter, "McDonald's Readies Trans-Fat-Free Oil," Associated Press, Jan. 29, 2007 | | | |
| Editor and Publisher, "Top 25 Daily Newspapers in Latest FAS-FAX," Apr. 28, 2008. | | | |
| Expanding the shrinking drive-thru; http://www.qsrweb.com/article.php?id=686 | | | |
| Extended Hours Grow More Common; http://www.qsrweb.com/article_printable.php?id=9463&page=143 | | | |
| Francine Lafontaine, "Pricing Decisions in Franchised Chains: A Look at the Restaurant and Fast Food Industry," NBER Working Paper, Sept. 1995. | | | |
| FTC Approves Triarc's Buyout of Wendy's; http://sanantonio.bizjournals.com/columbus/stories/2008/05/26/daily34.html | | | |
| Geoffrey Donovan and David Nicholls, "Estimating Consumer Willingness to Pay a Price Premium for Alaska Secondary Wood Products," USDA Research Paper PNW-RP-553, Oct. 2003. | | | |
| Hoover's Profile for Wendy's International; http://www.answers.com/topic/wendy-s-international?cat=biz-fin | | | |
| Itai Ater and Oren Rigbi, "Price Advertising in Franchised Chains: The Case of McDonald's Dollar Menu," Nov. 2007. | | | |
| Jason West et al., Deutsche Bank, "Restaurants Transferring Coverage – Reservations Available," Jun. 7, 2007. | | | |
| Jill Bruss, "'Translator Please' Shoppers speak out on trans-fats—they don't necessarily know what they are, but they're concerned," Private Label Buyer, Mar. 1, 2005. | | | |

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| John S. Glass et al., CIBC World Markets, "Our 2007 Annual Unit Count Survey - Casual Dining Finally Reaches And Inflection Point: Bodes Well For Future SSS," Oct. 7, 2007. | | | |
| Kelly B. Maguire, et al., "The Price Premium for Organic Babyfood: A Hedonic Analysis," Journal of Agricultural and Resource Economics, 2004 29(1):132-149. | | | |
| Lab Tests Show McDonald's Fries are virtually Trans-Fat-Free in the Big Apple!, http://www.cspinet.org/new/200708021.html | | | |
| Larry Miller et al., RBC Capital Markets, "Miller's Digest - Q1 2007 Quarterly Restaurant Review," Jun. 8, 2007. | | | |
| Larry Miller et al., RBC Capital Markets, "Miller's Digest - Q4 2007 Quarterly Restaurant Review," Apr. 1, 2008. | | | |
| MDS Top Circulation Publications, http://www.mdsconnect.com/topcirculation.htm | | | |
| Mitchell J. Speiser And Brian J. Wang, Buckingham Research Group, "Burger King Holdings (BKC) Initiating Coverage With A Strong Buy," Apr. 15, 2008. | | | |
| Pascale Le Draoulec, "Trans Fat R.I.P.: Thanks to Wendy's new policy, these fries aren't so bad for you after all," New York Daily News, Jul. 26, 2006. | | | |
| Salads or No, Cheap Burgers Revive McDonald's; http://www.wendys-invest.com/ne/wen121807.php | | | |
| Sarah Kugler, "NYC Board of health poised Tuesday to prohibit unhealthy trans fats in restaurants," Associated Press, Dec. 5, 2006. | | | |
| Survey of Consumer Attitudes and Preferences in Quick-Service Restaurants 18-34; http:// www.qsrmagazine.com/articles/features/116/consumer_charts/53/18-34 | | | |
| Survey of Consumer Attitudes and Preferences in Quick-Service Restaurants Over 65; http://www.qsrmagazine.com/articles/features/116/consumer_charts/33/over_65 | | | |
| The New York Times Media Group Circulation - New England, http://www.nytco.com/company/business_units/new_england_media_group.html | | | |
| The New York Times Media Group Circulation; http://www.nytco.com/company/business_units/new_york_times_media_group.html | | | |
| Top 100 Newspapers in the United States; http://www.infoplease.com/ipea/A0004420.html | | | |
| Vanilla Frosty with Nintendo Wii™, May 21, 2007; http://www.wendys-invest.com/ne/wen052107frostyfloat.php | | | |
| Wendy's Press Release Aug. 24, 2006; http://www.wendys-invest.com/ne/wen082406milie stone.php | | | |
| Wendy's Press Release, "Build Wendy's New Burger" Contest, Sept. 7, 2007; http://www.wendys-invest.com/ne/wen090707.php | | | |
| Wendy's Press Release, Jun. 8, 2006; http://www.wendys-invest.com/ne/wen060806transfat.php | | | |

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Wendy's Press Release, Wendy's Rhapsody Partnership, Nov. 12, 2007; http://www.wendys-invest.com/ne/wen111207.php | | | |
| Wendy's Restaurant Data; http://www.wendys-invest.com/main/restaurant_data | | | |
| Wendy's Restaurants Drop Trans Fat from Cooking Oil – Switch Is A First for Major Chains; http://www.boston.com/business/globe/articles/2006/08/25/wendys_restaurants_drop_trans_fats_from_cooking_oil/ | | | |
| Wendy's Will Be 1st Fast Foodie with Healthier Oil; http://www.usatoday.com/money/industries/food/2006-06-08-wendys-usat_x.htm | | | |
| Wendy's Customized Menu Options; http://www.wendys.com/food/Nutrition.jsp | | | |
| Wendy's International Inc., Annual Report (Form 10-K) (Feb. 27, 2008). | | | |
| What's Tops in Fast Food? Hint: It's Not Salad," Associated Press, Dec. 13, 2005; http://www.msnbc.msn.com/id/10454311/ | | | |
| Wire Report, "Wendy's Has No Trans Fat," Tampa Tribune, Aug. 25, 2006. | | | |
| Wire Report, "Wendy's Switches to Healthier Oil," The Miami Herald, Aug. 25, 2006. | | | |
| Yuko Onozaka, et al., "What Exactly are They Paying For? Explaining the Price Premium for Organic Fresh Produce," University of California Giannini Foundation Agricultural and Resource Economics Update, Jul./Aug. 2006. | | | |

**Exhibit 4**

*Confidential- Subject to Protective Order*

### EVALUATION OF PLAINTIFFS' CLAIM THAT WENDY'S ALLEGED WRONGFUL CONDUCT IS SUBJECT TO CLASSWIDE PROOF[1]

a. Evaluate the likelihood that the potential Class member paid a price differential for lower trans-fat content.

    i. Identify the location of the purchase to see if the potential Class member's purchase occurred at a company-owned store or franchised store. On average, franchised stores did not raise prices as much as company-owned stores, if at all.

    ii. Identify at which franchise store the potential Class member made a purchase (if applicable). Some franchise stores increased prices, some kept prices constant, and others decreased prices.

    iii. Identify timing of purchase (matched with store location) to investigate whether an increase in price had occurred by the time of the claimed purchase.

    iv. Identify which product (i.e., kid's, small, medium, or large à la carte french fries, or combination meal with french fries) was purchased by each potential Class member. Price increases were only suggested for the medium and large french fries. With respect to combination meals, hamburgers and drinks were also re-priced.

    v. Analyze pricing of Wendy's products relative to nearby competitive options that contain trans fat to establish the existence and magnitude of a premium relative to those competitive offerings.

b. Determine whether the potential Class member was aware of Wendy's trans-fat representations prior to purchase.

    i. Determine the source of the potential Class member's awareness, if any, of the trans-fat levels in Wendy's french fries.

    ii. Determine what information was conveyed to the potential Class member regarding the trans-fat levels in Wendy's french fries.

    iii. Determine the potential Class member's understanding of the representations made regarding the trans-fat levels in Wendy's french fries.[2]

---

[1] This summary is intended to be an overview. A full description of these factors is contained in the body of this declaration.

[2] The potential Class member's understanding could vary. For example, the potential Class member could have no expectation of a reduction in trans fats, an expectation that Wendy's trans-fat levels were lower than those of its competitors, or an expectation that Wendy's trans-fat levels were lower than previous levels.

*Confidential- Subject to Protective Order*

    iv.  Determine whether the potential Class member was aware of subsequent disclosures regarding the trans-fat levels in Wendy's french fries.

  c.  Evaluate the factors that influenced the purchase by the potential Class member to assess if a preference for lower trans-fat content was the basis for the purchase decision.

    i.  Evaluate the potential Class member's awareness of/and preference for lower trans-fat foods generally.

    ii.  Identify the location of purchase to evaluate competitive options and preference for convenience and quick service.

    iii.  Identify the time of day purchase occurred to evaluate competitive options and to assess trans-fat preference.

    iv.  Identify if purchase was a walk-in or drive-through to evaluate preference for convenience and quick service.

    v.  Determine whether potential Class member purchased during a major promotional event to assess other factors that influenced the purchase decision.

    vi.  Analyze the potential Class member's purchase patterns to determine if he/she was a significant repeat buyer from Wendy's before, during and after the trans-fat representations and disclosures to assess other factors that influence purchase decision.[3]

---

[3] This analysis could identify first time customers who potentially considered the trans-fat change to be an important purchase determinant; customers who continued to eat Wendy's french fries after subsequent disclosures concerning the level of trans fats, suggesting trans-fat levels were not a purchase factor; customers who also purchased french fries at competitors during the Class period, demonstrating a preference for fries generally, but not low trans-fat fries; and customers who consumed low trans fats foods at the time of french fry purchase, suggestive of a preference for low trans-fat levels.