# Exhibit 9

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

1        C O N F I D E N T I A L

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------

5    ADAM JERNOW and LEAH McLAWRENCE,

6    on behalf of themselves and all

7    others similarly situated,

8           Plaintiffs,

9                                              No. 07-CV-

10            -against-                        3971

11                                             (LTS)

12    WENDY'S INTERNATIONAL, INC.,

13           Defendant.

14    ------------------------------------

15                    May 7, 2008

16                    10:02 a.m.

17

18    Deposition of ADAM JERNOW, taken by Defendant,

19    pursuant to Notice, at the offices of Dreier,

20    LLP, 499 Park Avenue, New York, New York, before

21    Lisa Rosenfeld, a Shorthand Reporter and Notary

22    Public within and for the State of New York.

Page 1

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 22

1
2
3   REDACTED
4
5
6
7
8     Q. What did you do to prepare for your
9  deposition today?
10    A. I met with my counsel and got dressed
11 and really not that much.
12    Q. Did you review any documents?
13    A. Yeah, I reviewed the documents that I
14 had already seen. They were Wendy's had asked
15 some questions, we replied. So yes, I reviewed
16 some documents.
17    Q. Were you asked to search for
18 documents in response to a document request
19 issued by Wendy's in this case?
20    A. No, I was not asked to search for
21 documents.
22    Q. Have you ever reviewed your personal

Page 23

1  documents for materials that might be relevant to
2  this lawsuit?
3     A. I reviewed -- there were just some
4  photos. Some photos of a friend of mine who I
5  know ate with me at Wendy's, that was about it.
6     Q. Who is that friend?
7
8        REDACTED
9
10
11    Q. And you reviewed some photos of him?
12    A. Yes.
13    Q. In what connection?
14    A. Well, I knew they were taken the
15 weekend that we went to Wendy's.
16    Q. Did you give copies of those photos
17 to your lawyers?
18    A. They're electronic and my lawyers
19 have seen them.
20    Q. Do you know why they haven't been
21 produced to Wendy's?
22    A. No.

Page 24

1     Q. Other than the photos that you have
2  described, have you been asked to search your
3  personal documents for any materials relating to
4  this case?
5     A. There was a question early on if I
6  had a receipt, but I know that I don't have the
7  receipt so that's the only time -- the only thing
8  that I can think of that was relevant.
9     Q. Have you given your lawyers any
10 documents to be produced in this case?
11    A. I don't think I've given them any
12 physical documents but I've helped them to answer
13 questions. Oh, I did give them the resume,
14 sorry, that is a document.
15    Q. Anything other than the resume?
16    A. Nothing comes to mind.
17    Q. Have you ever discussed this lawsuit
18 with anyone other than your lawyers?
19    A. This lawsuit, my girlfriend, I told
20 her what it was and my dad searches on my name
21 and asked what's the Wendy's thing about, that's
22 about it.

Page 25

1     Q. Your dad and your girlfriend and who
2  else?
3        MR. WEISS: Besides his lawyers?
4     A. Yeah, my lawyers. That's all that
5  comes to mind.
6
7
8
9        REDACTED
10
11
12
13    Q. Describe if you would, Mr. Jernow,
14 how you came to be a plaintiff in this lawsuit?
15       MR. WEISS: Let me just caution the
16    witness not to reveal any
17    attorney-client -- the substance of any
18    attorney-client communication.
19    A. Let me answer your question. I am
20 friends with Kim who's one of the partners at
21 Reese Richman and he mentioned to me that he was
22 looking into Wendy's for saying that it had zero

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 26

1 trans fats, and I said, hey, wait, I've eaten at
2 Wendy's, and he explained to me the nature of the
3 case and so I said I've been affected by that,
4 and I think that from my understanding of what
5 you're saying that what they're doing is wrong
6 and that was pretty much how I got involved.
7   Q. So the lawsuit was not your idea?
8   A. No, it was not so much my idea but I
9 said I have definitely been affected by it.
10   Q. The Kim you're referring to is Kim
11 Richman?
12   A. Yes.
13   Q. You said you're friends with him.
14 How are you friends with him?
15   A. I dated a girl who was friends with
16 his wife.
17   Q. How long have you known Kim Richman?
18   A. I met him at that girl's birthday
19 dinner in it must have been 2006. I don't
20 remember the date but 2006.
21   Q. Did there come a time when Mr.
22 Richman became your attorney for purposes of this

Page 27

1 lawsuit?
2   A. Yeah.
3   Q. When was that?
4   A. It would have also been 2006.
5   Q. At what point?
6   A. I don't remember. I remember it was
7 warm out, we were running, we went jogging
8 together outside, but I'm not sure what month
9 that was.
10   Q. So during a run with Mr. Richman you
11 agreed that he would -- or he agreed to serve as
12 your lawyer, is that right?
13   A. I believe that that's -- yeah, we
14 talked about it and I said that I had been
15 affected, and I think that's when we decided that
16 I would do this, yeah, I think that's right as
17 best that I can recall.
18   Q. Are you familiar with the complaint
19 that was filed in this lawsuit under your name?
20   A. Yes.
21   Q. Did you personally investigate any of
22 the facts alleged in the complaint?

Page 28

1   A. No, most of the facts other than the
2 Consumer Reports I believe were presented to me
3 by my counsel.
4   Q. Why do you exclude the Consumer
5 Reports article from your answer then?
6   A. Because I think I saw it after we had
7 filed and I said, hey, that's directly applicable
8 to the lawsuit that I'm involved with.
9   Q. So other than a Consumer Reports
10 article, as far as you know, the facts in the
11 complaint came from your counsel and not from
12 you?
13   A. That's right. I've never been tested
14 or anything.
15   Q. Are you seeking to be named a class
16 representative by the court in your case?
17   A. I believe I am. That is -- that's
18 what the lead person does, right? Yeah.
19   Q. What do you understand your
20 obligations as a class representative to be?
21   A. Things like showing up here for the
22 deposition, things like showing up if we go to

Page 29

1 trial to testify there, and testifying that I did
2 indeed consume Wendy's food under the impression
3 that they were healthier than other alternatives.
4 To demonstrate that I was actually personally
5 affected.
6   Q. Any other obligations to the class,
7 as a class representative?
8   A. Not really. I mean nothing that
9 comes to mind. You could remind me of something
10 and I can say, yeah, I knew that, but nothing
11 else that comes to mind.
12   Q. Can you define the class that you
13 seek to represent?
14   A. Sure, I believe I can. I know that I
15 am named as is another woman, first name Leah,
16 and it would be all the people who ate Wendy's
17 food under the assumption that it was healthier
18 than alternatives, and also it was trans fat-free
19 based on advertising that Wendy's made up or
20 Wendy's distributed.
21   Q. Is that your complete definition of
22 the class as you understand it?

Case 1:07-cv-03971-LTS-THK   Document 43-10   Filed 06/19/2008   Page 5 of 13

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 62

1  the term, "retention agreement"?
2      MR. REESE: Engagement agreement.
3      A. Engagement agreement, so I'm only
4  responsible for their costs if I walk away.
5      Q. So the costs are being advanced by
6  your attorneys, is that right?
7      A. Yes.
8      Q. Are you involved at all in managing
9  the costs incurred in this lawsuit?
10     A. No.
11     MR. WEISS: Objection.
12     You can answer.
13     Q. Do you understand that Wendy's could
14 seek to recover from you costs incurred in this
15 lawsuit potentially?
16     MR. WEISS: Objection.
17     A. No, I did not understand that.
18
19          REDACTED
20
21
22

Page 63

1
2
3
4
5
6
7
8          REDACTED
9
10
11
12
13
14
15
16
17     Q. How many times have you eaten Wendy's
18 food?
19     A. Total in my lifetime?
20     Q. Yes.
21     A. Quite a few, numerous. I don't
22 even -- I don't even want to take a guess at

Page 64

1  quantifying.
2      MR. WEISS: Do you want to give him a
3      range?
4      Q. Let's say before June 2006, how many
5  times had you eaten at a Wendy's?
6      A. Well, I can help to answer the
7  question by saying Wendy's was the closest --
8  Wendy's was on the closest corner to Cornell for
9  four years while I was there, and then Wendy's in
10 Boston was right around the corner from me for a
11 year and a half to two years while I was there.
12 So I would give a range of 100 to 200 times over
13 the course of a lifetime. That's an estimate.
14     Q. My question was before June 2006.
15     A. Yeah, that -- right, because after
16 that I have scaled back drastically.
17     Q. So you were at Cornell from '92 to
18 '96?
19     A. Yes.
20     Q. And you regularly ate at the Wendy's
21 that was close to Cornell in Ithaca, New York?
22     A. I wouldn't say regularly, I would say

Page 65

1  I certainly did it frequently, but regularly
2  would suggest I did it on a schedule.
3      Q. Frequently though you did?
4      A. Fine, yes.
5          REDACTED
6
7      A. Yes, that actually was regular, that
8  would have been on the weekends.
9      Q. You regularly ate at a Wendy's in
10 Boston during the time period 2003 to 2005?
11     A. Yes.
12     Q. If I understand your testimony, you
13 would estimate that prior to June 2006 you had
14 eaten at a Wendy's about 100 to 200 times?
15     A. Yes, that's correct.
16     Q. Now, I want you to think about the
17 period June 2006 to the end of 2006, how many
18 times did you eat at Wendy's during that period?
19     A. Probably only twice.
20     Q. Since the beginning of 2007 how many
21 times have you eaten at Wendy's?
22     A. Just once.

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 66

1  Q. When was that?
2  A. I believe it was -- you know what, I
3  don't recall. I remember going there though.
4  Q. Before or after you filed this
5  lawsuit?
6  A. After.
7  Q. So as I understand it, prior to June
8  2006 you ate at Wendy's 100 to 200 times. From
9  June 2006 to the end of 2006 you believe you ate
10 at Wendy's approximately twice. And since the
11 end of 2006 you've eaten at Wendy's once, is that
12 right?
13     MR. WEISS: Objection.
14     You can answer.
15 A. I think that's correct.
16 Q. I want to ask you about the times
17 you've eaten at Wendy's since June of 2006.
18     MR. WEISS: Including June of 2006?
19 Q. Including June 2006.
20 A. Yes.
21 Q. What is the first time that you
22 remember visiting Wendy's since the end of May

Page 67

1  2006?
2  A. It would have been in Boston with my
3  friend Bobby on a Friday evening, I believe.
4  Does that answer your question?
5  Q. In Boston with Bobby on a Friday
6  evening?
7  A. Or nighttime. Really nighttime.
8  Q. And what month?
9  A. June.
10 Q. Do you remember the date?
11 A. It would have been around June 20th.
12 Q. June 20th, 2006, where in Boston?
13 A. I think it was Boyelston, right
14 near -- it's certainly in the Back Bay, Boston
15 Back Bay near the -- pretty close to the Comets,
16 Boston Comets.
17 Q. How is it that you're able to
18 remember approximately June 20th, 2006?
19 A. Well, Bobby and I then went up to New
20 Hampshire and we have photographs from New
21 Hampshire that had the date of June 20th, and I
22 remember distinctly going there because I drove

Page 68

1  from New York to Boston where I picked up Bobby
2  and parked outside of Wendy's and we grabbed --
3  we met with some friends of mine, then we grabbed
4  some Wendy's and got in the car and drove up to
5  New Hampshire.
6  Q. And this was a Friday evening as you
7  recall it?
8  A. Yes.
9       REDACTED
10
11 A. Yes.
12 Q. Was there anyone else with you?
13 A. No, it was just the two of us because
14 just the two of us drove the way.
15 Q. Did you go inside the Wendy's or did
16 you go through a drive-thru?
17 A. Physically inside.
18 Q. What did you order?
19 A. Spicy chicken sandwich, large fries
20 and a frosty.
21 Q. Did you order those items
22 individually or in some sort of a combo?

Page 69

1  A. I don't remember. My guess is I
2  would have gotten combo and they would have
3  charged me a little extra for the frosty rather
4  than a soda, because as I recall, that's the way
5  they did it, but I don't recall distinctly.
6  Q. How is it that you're able to
7  remember what you ordered on that particular
8  occasion?
9  A. Because that's what I liked from
10 Wendy's and I hadn't had Wendy's in quite a while
11 at that point and that's what I ordered. I mean
12 that's what I almost always got from Wendy's.
13 Q. On this occasion on June 26th, 2006
14 in Boston did you pay for the Wendy's food?
15 A. I did.
16 Q. Did you pay for Bobby's food as well?
17 A. Yes, I did.
18 Q. What did Bobby order?
19 A. I don't remember.
20 Q. How much did you pay?
21 A. I don't remember. I don't remember
22 the total. Because I don't remember what Bobby

18 (Pages 66 to 69)

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 70

1  ordered.
2  Q. Do you remember how much you paid for
3  the spicy chicken sandwich that you ate?
4  A. I really don't recall.
5  Q. Do you remember how much the large
6  fries were?
7  A. No, I don't remember what I paid at
8  that time.
9  Q. Did you eat the food?
10  A. Yes, I ate the food.
11  Q. Did you eat it all or did you throw
12  some of it away?
13  A. I would have eaten it all.
14  Q. What's the next time following
15  chronologically, when is the next time you
16  remember eating at a Wendy's?
17  A. Later that summer when I was moving
18  from -- I was moving some stuff into the Thom --
19  it was around the Thompson Street move, the move
20  into Thompson Street, and that would have been at
21  a rest stop in Yonkers.
22  Now in reviewing the notes that me

Page 71

1  and my lawyers took, I don't recall whether I
2  ordered a hamburger or a spicy chicken sandwich.
3  I know I would have tried to order a spicy
4  chicken sandwich and for some reason I think that
5  they might not have had them. Either they were
6  out or they might have not had the menu item.
7  But I also ordered fries and a frosty. I also do
8  the fries and frosty.
9  Q. So this was an occasion sometime in
10  the summer 2006?
11  A. Yes, after June.
12  Q. Can you pinpoint the month, July,
13  August?
14  A. Either late July or early August, it
15  was very, very hot.
16  Q. This was at a rest stop in Yonkers?
17  A. Yes.
18  Q. On a particular road or highway?
19  A. Yeah, I think it's where 487 becomes
20  287 or joins with 287, I think that's where it
21  was. Close to Stew Leonard's.
22  Q. What time of day was it?

Page 72

1  A. Midday.
2  Q. Lunchtime?
3  A. Lunchtime.
4  Q. Was anyone with you?
5  A. No, I was alone.
6  Q. Did you go through the drive-thru or
7  go inside?
8  A. Go inside.
9  Q. As I take it, you can't recall
10  whether you had a hamburger or a spicy chicken
11  sandwich, is that right?
12  A. Yeah. I would have always ordered
13  the spicy chicken but for some reason I remember
14  not being able to get it there for some -- I
15  don't know why that was. It's kind of it's a
16  hazy memory, but if they had the spicy chicken, I
17  would have gotten it.
18  Q. So what kind of hamburger did you
19  order?
20  A. It would not have been the triple
21  stacker or even the double stacker, it would have
22  been the single one.

Page 73

1  Q. You say would have, does that mean
2  you don't actually remember?
3  A. Right, because if I remembered which
4  kind of hamburger that I had gotten then I would
5  have remembered if it was a hamburger or spicy
6  chicken.
7  Q. So you can't say for sure that on
8  this occasion in late July/early August in 2006
9  whether you actually bought a spicy chicken
10  sandwich at Wendy's, right?
11  A. That is correct.
12  Q. What size fries did you order?
13  A. Large.
14  Q. Do you recall how much you paid for
15  your Wendy's food on this occasion, late July or
16  early August?
17  A. No, I do not recall.
18  Q. Again did you eat the food that you
19  bought at Wendy's that day?
20  A. Yes, I did.
21  Q. And you finished the food entirely?
22  A. Yes, I did.

Case 1:07-cv-03971-LTS-THK   Document 43-10   Filed 06/19/2008   Page 8 of 13

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 98

1  or has it been essentially the same?
2    A.  It's gotten slightly less but we're
3  talking about going from small to even smaller.
4    Q.  So as I understand it, generally
5  you'd drink a little bit on the weekends and less
6  during the week?
7    A.  Yeah.
8
9           REDACTED
10
11
12   A.  I would go out usually to dinner in
13 2006 and '7.  Does that answer your question?
14   Q.  How frequently?
15   A.  On the weekends I would go out
16 probably Friday night, Saturday night and Sunday
17 during the day or at night.
18   Q.  Any places, any restaurants in
19 particular that you would frequent?
20   A.  Nothing that really comes to mind.
21   Q.  Can you think of a restaurant that
22 you've been to more than say three times over the

Page 99

1  last two years?
2    A.  Three times in the last two years in
3  Manhattan, yes, Jpan, a Japanese sushi joint in
4  Park Slope.
5    Q.  Any others?
6    A.  There is one, three times -- yes,
7  Hill Country Barbecue.
8    Q.  Which is where?
9    A.  26th and Fifth Avenue -- no, 26th and
10 Sixth Avenue -- no, yes.
11      MR. REESE:  It's the best barbecue in
12   the city, by the way.
13   Q.  Any others that you can think of
14 other than the Japanese and the barbecue that you
15 can recall?
16   A.  That I've been to three times in the
17 last three years?
18   Q.  Two times is the question.
19   A.  Oh, the last two years.  I don't
20 really choose -- I've never been one who really
21 chose one sit-down restaurant and just frequented
22 it.  So there were -- I think that there are

Page 100

1  some -- so no, the answer is no.
2    Q.  Over the course of 2006 and 2007, how
3  often did you eat fast food?
4    A.  Not often.
5    Q.  Which is how much?
6    A.  Pretty much only when I was on a road
7  trip or driving.  And to answer -- sorry, and
8  that's that.
9    Q.  So can you give me an estimate of how
10 many times you've eaten at a fast food
11 establishment in 2006 and 2007?
12   A.  I would say in total 2006 and '7
13 would have been 24 months, far less than 24
14 times, call it maybe ten times.
15   Q.  You've talked about how it was your
16 habit when you went to Wendy's to order french
17 fries.  Is it generally your practice during that
18 period 2006/2007 to order french fries when you
19 ate at other establishments?
20   A.  Yes.
21   Q.  Have you ever eaten at a McDonald's?
22   A.  Yes.

Page 101

1    Q.  How many times have you eaten at a
2  McDonald's?
3    A.  In my lifetime?
4    Q.  Yes.
5    A.  100 to 200 times.
6    Q.  During the period 2006/2007 how
7  frequently at McDonald's?
8    A.  Five times at the most.
9    Q.  How many of those would have been in
10 2007?
11   A.  It's an estimate but I'm going to
12 estimate three.
13   Q.  Typically do you order french fries
14 when you go to McDonald's?
15   A.  Yes.
16   Q.  What else do you typically order from
17 McDonald's?
18   A.  A burger, but -- a burger and
19 nuggets.
20   Q.  What kind of burger?
21   A.  I don't have a preference.
22   Q.  So sometimes a Big Mac, sometimes a

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 102

1 quarter pounder, that sort of thing?
2    A.  That sort of thing.
3    Q.  Do you have a practice with respect
4 to the size of nuggets that you order when you go
5 to McDonald's?
6    A.  Six piece.
7    Q.  How many times have you eaten at a
8 Burger King?
9    A.  Not many. If we're talking -- if
10 we're looking at it as less than ten times for
11 fast food and that would be Wendy's, McDonald's
12 and Burger King, I would know that I did Wendy's
13 three times and I say that I've done McDonald's
14 five times, then the difference is just two times
15 in two years.
16   Q.  So can you give an estimate of how
17 many times you've eaten at Burger King in the
18 last two years?
19   A.  I'd estimate twice.
20   Q.  Do you typically order french fries
21 at Burger King?
22   A.  Yes.

Page 103

1    Q.  What else do you typically order when
2 you go to Burger King?
3    A.  Probably a burger.
4    Q.  Anything else?
5    A.  Not that comes to mind.
6    Q.  Kentucky Fried Chicken, have you
7 eaten there in the last two years?
8    A.  I don't think so.
9    Q.  Also known as KFC now?
10   A.  I still haven't been there.
11   Q.  What about Duncan Donuts, do you ever
12 go to Duncan Donuts?
13   A.  I'm not a Duncan Donut visitor,
14 certainly not for anything other than a donut,
15 and I don't even think I've done that.
16   Q.  Have you eaten donuts from other
17 places in the past two years?
18   A.  Yes, I've eaten Krispy Kreme donuts
19 probably a full two years ago, and not by
20 visiting but because they were being given out.
21   Q.  That reminds me of another question.
22 We've talked about the times that you visited a

Page 104

1 Wendy's in the last two years or so or since June
2 2006, you talked about three times that you
3 visited Wendy's. Have you eaten Wendy's food
4 other times during that period since June 2006?
5    A.  I don't believe so.
6    Q.  Have you eaten at Subway in the last
7 two years?
8    A.  Yes, I have.
9    Q.  How frequently?
10   A.  Maybe three times.
11   Q.  What do you order when you go to
12 Subway?
13   A.  Turkey sandwich.
14   Q.  Anything else?
15   A.  I get all the vegetables on it.
16   Q.  Anything else?
17   A.  Not that I can recall, no.
18   Q.  Have you eaten at Starbucks in the
19 last two years?
20   A.  I recently got a turkey sandwich from
21 Starbucks.
22   Q.  Any other times?

Page 105

1    A.  No.
2    Q.  If you were unavailable for some
3 reason who would be the best person for me to ask
4 about your eating habits over the last two years?
5    A.  My girlfriend. Two years?
6    Q.  Yes.
7    A.  Still my girlfriend.
8    Q.  How frequently do you have meals with
9 her?
10   A.  Several times a week.
11   Q.  And when did your relationship with
12 her begin?
13   A.  This past July.
14   Q.  July 2007?
15   A.  Yes.

REDACTED

27 (Pages 102 to 105)

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 114

1  A. I'm not sure.
2  Q. Do you know whether she actively
3  avoids trying to consume trans fats?
4  A. She eats very healthily so I believe
5  that she tries to eat healthy and that may
6  involve avoiding foods cooked in trans fat or
7  cooked with trans fat.
8  Q. What kind of snack foods do you keep
9  in your home?
10  A. It's a lot of fruit there. There's
11  cheese, Zone bars, yogurt, almonds.
12  Q. Any cookies?
13  A. Not ordinarily.
14  Q. Over the last two years have you been
15  a cookie eater?
16
17
18           REDACTED
19
20
21
22  A. No, I did not.

Page 115

1  Q. Were they a brand name cookie that
2  were made available?
3  A. No, they were not.
4  Q. What about chips, potato chips,
5  tortilla chips, do you have them in your home?
6  A. Potato chips, we have had over the
7  past two years a brand or a label called Reduced
8  Guilt, which I believe is better for us than
9  other stuff.
10  Q. Did it reduce your guilt?
11  A. It did. Regarding to tortilla chips,
12  not really in the house.
13  Q. When was the first time you gave any
14  thought to the amount of trans fat in Wendy's
15  food?
16  A. It probably would have been when I
17  heard -- it probably would have been when I heard
18  the radio campaign -- it would have been when I
19  became aware of the campaign that Wendy's said --
20  where Wendy's claimed that it had no trans fats.
21  Q. And what did you hear in that regard?
22  A. That Wendy's foods did not contain

Page 116

1  trans fats.
2  Q. What's the source of that
3  information?
4  A. I'm just trying to remember, it might
5  have been when I was driving and I heard it on
6  the radio or it might have been in print. I
7  don't remember. I know that it was an impression
8  that I had. And -- that was when I formed that
9  impression.
10  Q. So you don't recall whether you heard
11  a radio advertisement or a radio news item or a
12  print news item or print --
13  A. I don't think it was a news item, I
14  think it was a radio advertisement or else it was
15  a printed advertisement. I don't think it was
16  reported by the media that drew my attention.
17  Q. Was this impression that you
18  developed that Wendy's food was trans fat-free,
19  did you develop that impression before you ate at
20  Wendy's in Boston in June of 2006 with Bobby
21  Raucher?
22  A. I believe that I did, yes.

Page 117

1  Q. And was it your understanding that
2  Wendy's food was completely free of trans fats?
3  A. Yes, that was my impression.
4  Q. And you got that impression from this
5  source that you can't identify, is that right?
6  A. That's right.
7  Q. Other than this source that you can't
8  identify that led to your initial impression,
9  what representations about trans fat content in
10  Wendy's food have you otherwise seen or heard?
11  A. The bag, I think that the bag said
12  zero grams of trans fat in print. So that's not
13  an advertisement per se in public media, that's
14  Wendy's printed -- it's Wendy's own, I don't know
15  what you call it, wrapping.
16  Q. What bag are you talking about?
17  A. The bag that Wendy's puts food in
18  when you order an item to go.
19  Q. And when is the first time you saw a
20  bag that -- a Wendy's bag that said something
21  about trans fat?
22  A. It probably would have been on my way

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 118

1  out of the Boston store.
2    Q.  You say probably, do you have a
3  recollection of that?
4    A.  Not a clear recollection, no.
5    Q.  Do you recall any other particular
6  time when you saw a representation about trans
7  fat on a Wendy's bag?
8    A.  Yes, I believe in my conversations
9  with my counsel.
10   Q.  Aside from in your conversations with
11 your counsel, any other times that you recall
12 seeing a representation about trans fat on a
13 Wendy's bag?
14   A.  No, just those two times would have
15 been -- those two times because I -- those two
16 times.
17   Q.  I'm sorry, which two times are you
18 referring to?
19   A.  On the way out of the Boston store
20 and with my counsel.
21   Q.  I thought you said you didn't clearly
22 recall seeing it on the bag when you came out of

Page 119

1  the Boston store?
2    A.  Right, but then you asked me any
3  other times and I said just those two.
4    Q.  Any other representations about trans
5  fat content in Wendy's food that you've seen or
6  heard other than what you've described so far?
7    A.  The Consumer Reports article as I
8  recall highlighted what Wendy's claimed.
9    Q.  When was the first time you saw a
10 Consumer Reports article or the Consumer Reports
11 article that you're referring to?
12   A.  I don't recall.
13   Q.  Any other representations about trans
14 fat content in Wendy's food that you've seen or
15 heard?
16   A.  In conversations with my counsel, or
17 not in conversation, in meetings with my counsel.
18   Q.  Any others?
19   A.  Nothing that comes to mind.
20   Q.  Did you ever look at one of the
21 nutritional posters posted in Wendy's store?
22   A.  I don't recall doing that.

Page 120

1    Q.  Did you ever look at Wendy's website?
2    A.  Not that I recall.
3    Q.  In the portfolio of stocks that you
4  own do you own any Wendy's stock?
5    A.  No, I do not.
6    Q.  Have you ever owned any Wendy's
7  stock?
8
9
10
11
12           REDACTED
13
14
15
16
17
18   Q.  Any others?
19   A.  Not that come to mind.
20   Q.  Have you ever visited a website
21 called mom-RD?
22   A.  Not to my knowledge.

Page 121

1    Q.  Have you ever seen a television
2  advertisement for Wendy's that mentions trans
3  fat?
4    A.  Not that I recall.
5    Q.  Have you ever heard a radio
6  advertisement for Wendy's that mentions trans
7  fat?
8    A.  I think I have.  It would have been
9  in the car.
10   Q.  What do you recall was said in the
11 advertisement about trans fat?
12   A.  I believe the claim was made that
13 Wendy's food didn't have any trans fat.
14   Q.  And when did you hear that radio
15 advertisement?
16   A.  That I don't recall.
17   Q.  Do you recall what radio station you
18 were listening to?
19   A.  No, because -- no, I don't.
20   Q.  Is there a radio station that you
21 regularly listen to in the car?
22   A.  No, because if I'm driving there's a

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 138

1  it was possible.
2      Q. And that was based on your
3  supposition as to what Wendy's might do if
4  someone filed a lawsuit against it?
5      A. That's correct.
6      Q. Do you recall when your lawsuit was
7  filed?
8      A. Long before that, no, I don't recall
9  it.
10     Q. May 2007, does that sound right?
11     A. That would have worked out. Yeah,
12 that sounds like it's a ballpark, yes.
13     Q. How long after your complaint was
14 filed do you recall visiting this Wendy's in
15 Manhattan?
16     A. More than a month. Certainly more
17 than a month.
18     Q. Since then you have not returned to
19 Wendy's, is that right?
20     A. That's right.
21     Q. Why not?
22     A. Because I found out that my -- that I

Page 139

1  was wrong that Wendy's has not changed the oil
2  that it uses.
3      Q. And when you say you found that out,
4  how did you find that out?
5      A. From my counsel and from really from
6  conversations with my counsel.
7      Q. When did you find out that
8  information?
9      A. I think I -- I don't recall the date.
10     Q. In what way were you injured by
11 Wendy's conduct that you are complaining about in
12 this lawsuit?
13     A. I don't think that it's about
14 personal injury, so I can't make a claim that I
15 have personal injury. I'm not making that claim.
16 I know that I ate trans fat and was told that I
17 was not eating trans fat.
18     Q. Again when you say you were told you
19 were not eating trans fat, is that based on
20 anything other than what you've already described
21 to me in terms of the sources of your
22 understanding about the content of trans fat?

Page 140

1      A. No, it's based on those.
2      Q. Do you claim to have suffered any
3  monetary injury as a result of the conduct you
4  complain about in your lawsuit?
5      A. Not really, no.
6      Q. Is it fair to say that on the three
7  occasions that we've talked about where you
8  visited Wendy's between June 2006 and the
9  present, that you spent less than $50 on Wendy's
10 food?
11     A. It is -- yes.
12     Q. If you had known the true amount of
13 trans fat in the french fries and chicken that
14 you ordered from Wendy's on those three
15 occasions, would you have been willing to buy
16 them at a lower price?
17     A. I don't think I would have eaten at
18 Wendy's, so the answer is no.
19         MR. McLISH: Defendant's Exhibit 3.
20         (Defendant's Exhibit 3, Second
21     amended complaint filed against Wendy's,
22     was so marked for identification.)

Page 141

1      Q. Mr. Jernow, the court reporter has
2  handed you what's been marked Defendant's Exhibit
3  3, please take a minute to look at the document
4  and familiarize yourself with it.
5          MR. WEISS: Do you want him to focus
6      on any particular portion of it?
7          MR. McLISH: I want him to look at it
8      as much as he wants before I start asking
9      him questions about it.
10     Q. I will tell you that I'm going to ask
11 you in particular about paragraph 19.
12     A. Okay, 19.
13     Q. First of all, are you familiar with
14 this document that's been marked as Defendant's
15 Exhibit 3?
16     A. I believe that I have seen this, yes.
17     Q. Is this the second amended complaint
18 filed against Wendy's in your lawsuit against
19 Wendy's?
20     A. I believe that it is, yes.
21     Q. Paragraph 19 on page 7 of Defendant's
22 Exhibit 3, the first sentence says "On February

36 (Pages 138 to 141)

Adam Jernow - CONFIDENTIAL MATERIAL - May 7, 2008
Adam Jernow and Leah McLawrence v. Wendy's International, Inc.

Page 154

1    Reports article of December 2007, was so
2    marked for identification.)
3    A.  There we go.
4    Q.  The court reporter has handed you
5    what's been marked as Defendant's Exhibit 7,
6    which is a two-page document produced by your
7    attorneys to Wendy's in this case.  Please take a
8    look at it and tell me if you're familiar with
9    it?
10   A.  This is the one that I saw.
11   Q.  Are you saying that the item on the
12   second page of Defendant's Exhibit 7 at the
13   bottom is the Consumer Reports article that
14   you're referring to?
15   A.  Yes.
16   Q.  You'll see that the date on
17   Defendant's Exhibit 7 is December 2007, is that
18   when you first saw this document?
19   A.  That sounds correct.
20   Q.  So looking back at Defendant's
21   Exhibit 6, which is the item that has November
22   2006 at the top, having looked at both of these

Page 155

1    documents, can you tell me whether or not you had
2    seen Defendant's Exhibit 6 before?
3    A.  I believe I may have glanced at it
4    with my attorneys, but when I think of what I
5    read in Consumer Reports, it's Defendant's
6    Exhibit 7.
7    Q.  Did you provide a copy of Defendant's
8    Exhibit 7 to your lawyers in this case?
9    A.  I did not provide it, I may have
10   brought their attention to, I don't recall.
11   Q.  When you've talked today about
12   Consumer Reports article being the source of your
13   understanding that Wendy's food had more trans
14   fat in it than you had previously understood, are
15   you talking about Defendant's Exhibit 6 or
16   Defendant's Exhibit 7?
17   A.  7.  Not only that, but also the
18   advertising campaigns that Wendy's paid for.
19   Q.  Just to be clear, I'm asking you
20   about where -- the source of your belief that
21   Wendy's food had more trans fat in it than
22   you understood.  What is the source of that

Page 156

1    belief?
2        MR. WEISS:  Again do not reveal any
3    attorney-client privileged communications.
4    You can answer.
5    A.  You're asking me to compare what I
6    read in the article versus my understanding.  The
7    article presents the results of a test but it
8    doesn't present my understanding.  So my
9    understanding would have come from the
10   advertisements and the knowledge of how a Wendy's
11   stacks up would have come from this.
12       So how Wendy's food stacks up against
13   my understanding comes from two places, the
14   advertisements and Defendant's Exhibit 7.
15   Q.  And when you refer to the
16   advertisements, you're talking about the possible
17   radio ad, possible print ad, possible poster,
18   possible bag that we talked about before,
19   correct?
20   A.  Yes, I am.
21   Q.  And nothing else, right?
22   A.  At the time -- yeah, at the time of

Page 157

1    purchase, yes, that is correct.
2    Q.  And when you filed your lawsuit
3    around May 2007, what was the basis of your
4    contention that Wendy's food had more trans
5    fat in it than you had understood when you
6    bought it?
7    A.  My understanding is based on the
8    advertisements that we talked about and the
9    contention came from my conversation with
10   counsel.
11   Q.  And it couldn't have been based on
12   Defendant's Exhibit 7 because Defendant's Exhibit
13   7 hadn't been published yet, right?
14       MR. WEISS:  Objection.
15       You can answer, I guess.
16   Q.  Isn't that right?
17   A.  Yes, that's correct.
18   Q.  When you have purchased food from
19   food establishments over the last two years, have
20   there been occasions when you have used a credit
21   card?
22   A.  Yes.

40 (Pages 154 to 157)